NUMBER 13-09-00204-CV

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

                                  CORPUS CHRISTI -
EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



PETROLEUM SOLUTIONS, INC.,                                                         Appellant,

 

v.

 

BILL HEAD D/B/A BILL HEAD ENTERPRISES

AND TITLEFLEX CORPORATION,                                            Appellees.

 

 



On appeal from the 398th District
Court

of Hidalgo County, Texas.

 

 



     MEMORANDUM OPINION

 

Before Chief Justice Valdez and
Justices Rodriguez and Vela

Memorandum Opinion by Chief Justice
Valdez

 

This appeal pertains to a
substantial leak of diesel fuel from an underground storage system located at
the Silver Spur Truck Stop in Pharr, Texas.  By thirteen issues, appellant,
Petroleum Solutions, Inc. (“PSI”), challenges the jury’s verdict in favor of
appellees, Bill Head d/b/a Bill Head Enterprises (“Head”) and Titeflex, Inc.,
and sanctions issued by the trial court, which included the assessment of costs
against PSI, the striking of PSI’s affirmative defenses, and a jury instruction
that PSI destroyed, lost, or failed to produce material evidence, namely a flex
connector that PSI asserted was the cause of the underlying leak.  PSI further
argues that:  (1) it is entitled to judgment on Head’s breach of fiduciary
duty, fraud, breach of contract, breach of warranty, and negligence claims; (2)
it is entitled to judgment on Titeflex’s indemnity claims; (3) the trial court
erred in failing to properly instruct the jury on overlapping damages; (4) Head
is not entitled to attorney’s fees or pre-judgment interest; (5) the judgment
improperly disregarded the jury’s proportionate responsibility finding; and (6)
it is entitled to judgment on its claims against Head for payment to clean-up
of the leak.  We affirm, in part, and reverse and remand, in part.             

I.             
Background

Head began his career as a truck
driver and eventually began acquiring trucks to establish a trucking business. 
At the same time, he worked part-time for a truck broker in Edinburg, Texas. 
Head desired to open his own trucking brokerage and truck stop.  In 1991, Head
purchased what was once known as The Tapadera, which is located in Pharr,
Texas.[1]  Head
renamed the facility the Silver Spur Truck Stop.  The facility included
nineteen acres of land, a restaurant, an office, and three steel underground
tanks and fuel dispensers.  In 1996, Head added a motel to the truck stop.  The
facility was operated as a truck stop and as a brokerage center for trucks
shipping products between Mexico and the United States.

A.   PSI’s
Installation of a New Underground Storage Tank System

Shortly after purchasing
the property, Head discovered that one of the steel underground tanks failed a
required tightness test, which resulted in it being removed from service. 
Later, the Texas legislature passed a new law requiring that steel underground
storage tanks be replaced or modified to protect against leaks.  In response to
the new law, in 1996, Head contracted with PSI to install a new fiberglass
underground storage tank system.  Head selected PSI to do the work because PSI
was local and he had heard good things about the company.  In fact, PSI is
exclusively engaged in the business of installing, repairing, maintaining, and removing
underground-storage-tank systems and compliance issues related to those
systems, and as Mark Barron, the president of PSI and Environmental Risk
Management (“ERM”), testified, PSI is a leader in this industry.

PSI’s proposal to Head
included the removal of the three steel tanks and the installation of two
twenty-thousand-gallon, double-walled fiberglass tanks to be used to store
diesel fuel.  Though State regulations did not require that the tanks be double-walled,
Head agreed to PSI’s proposal and work began.  Acting on Head’s behalf, PSI
filed a construction application with the Texas Natural Resource Conservation
Commission (the “TNRCC”), now known as the Texas Commission on Environmental
Quality.  After receiving approvals from the TNRCC, PSI removed the old steel
tanks and installed the new fiberglass tanks in a different area from where the
steel tanks were previously installed.  Barron testified that:

            First
off, we installed the new underground storage tanks those two 20,000-gallon
storage tanks.  We then probably took their system out of service because we
had to build new trenches to the existing dispensers to run new piping, which
we did, and after we dug the tanks or installed the tanks, dug the trenches,
installed the piping, modified the existing electrical to run to the new
system, hook up the existing pumps that we moved from their old system to the
new tanks, hooked all that up, backfilled, powered concrete, checked everything
out, did testing on the tanks and the lines as it’s required, started to open
business, then we moved the old system.  That’s the whole project,
basically.        

 

PSI completed construction
on the new system in 1997.

B.   PSI’s
Installation of a New Release Detection System

            According to Bill Morris, an inspector for PSI
and a previous employee of the TNRCC, on December 22, 1998, the State enacted
new regulations requiring improved release detection methods.  Among the
methods approved for usage by the State was an automatic tank gauging system
(“ATG”), which reconciles fuel lost and added to the storage tanks to determine
if a release has occurred.[2]  At the
time, Head was using the stick method, gauging fuel in the underground storage
tanks using long, calibrated measuring sticks.  In response to the new
regulation, PSI recommended that Head install a new ATG system.  PSI told Head
that the ATG system “was supposed to do all the work and should—should alert us
whenever we had a leak.”  Further, based on the advice of PSI, Head agreed to
the installation of the ATG system.  PSI completed the installation of the ATG
system in October 1999.  Because of the ATG system, Head discontinued using the
stick method to monitor inventory levels.

C.   Problems With
the Release Detection System

            Shortly after PSI installed the
underground storage tank and ATG systems, Head began to experience many
problems.  Between 1997 and 2001, Head requested that PSI maintain and/or
repair the system numerous times.[3]  Head
testified that PSI’s systems caused him more problems than his old system and
that PSI serviced the systems on a “[p]retty regular [basis].”  Head recalled
that the ATG system was usually the reason for the problems.  Head authorized
Robert Carpenter, the manager of the Silver Spur Truck Stop, to contact PSI
whenever a problem arose with the systems.  Carpenter recalled that PSI was the
exclusive entity that maintained and repaired the systems.    

            In late October 2001, Carpenter went
on vacation.  When he returned in early November 2001, Carpenter discovered
additional problems with the underground storage tanks.  Gilbert Obregon, a
clerk at the Silver Spur Truck Stop, testified that, when reconciled each
month, the ATG system always revealed an overage or shortage with respect to
the amount of diesel fuel purchased and the amount of fuel in the storage
tanks.  Oddly, at the end of October, Obregon noticed that the ATG system
reconciled 100 percent.  Nevertheless, while Carpenter was on vacation, the
inventory numbers became more volatile.  Carpenter described the volatility as
such:

The
numbers of the inventory didn’t match up, but it was taken off the ATG.  They
were bouncing back and forth within the time I was gone.  One day we would have
a minus fuel, and the next day a plus fuel, which would balance out, but as
time progressed on, these numbers—it became evident that there was a potential
problem on hand.[[4]]

 

As a result of his observations, Carpenter notified
PSI.  Head allowed PSI to investigate the systems to determine the extent and
source of the perceived problem.

D.   The Leaking of
Diesel Fuel

            In the course of its investigation, PSI
discovered that a major release of diesel fuel had occurred.  Experts estimated
that more than 20,000 gallons of diesel fuel was recovered from underground. 
Barron acknowledged that the fuel had leaked “quite aways [sic]” from the
Silver Spur Truck Stop, including a drainage ditch that bordered the property and
that he had “no idea how much [diesel fuel] they lost.”[5] 
Carpenter denied seeing any diesel fuel on the asphalt surrounding the truck
stop; however, one of Head’s expert witnesses, Daniel Airey, an environmental
consultant for Ranger Environmental Services (“Ranger”), stated that, based on
a monitor well Ranger implemented on the northern side of the truck stop, diesel
fuel leaked from 5.78 feet to 19.95 feet underground.  Airey further noted that
diesel fuel had leaked into the water table, which is located at 18.82 feet
underground where the monitor well was placed.  Upon discovering that a major
leak had occurred, Barron traveled to the scene.  Barron admitted that when he
was told about the leak, he anticipated that PSI would be sued because PSI had
installed the underground storage tank and ATG systems.  

E.   PSI’s
Determination of the Source of the Leak

Several PSI employees
investigated the underground storage tank system to determine the cause of the
leak.[6]  PSI
examined the double-walled fiberglass tanks, the system’s piping, and the
dispensers.  Barron testified that the tanks were subjected to two pressurized
leak tests, both of which they passed.  PSI then tried to test the system’s
piping, but PSI could not “establish pressure on the piping.”  Based on the
inability of the system’s piping to establish pressure, PSI concluded that the
leak must be located somewhere within the piping system.

Later, Barron approached
Carpenter and informed him that the source of the leak was a faulty flex
connector located under “Dispenser Number 4.”  Barron showed Carpenter the
alleged faulty flex connector and allegedly told Carpenter the following:  “I’m
the vendor, I would like to take this part over to our location to our office
and keep it for safekeeping and maybe testing at a later time.”  Carpenter
allowed Barron to take the allegedly faulty flex connector because he “didn’t
really have a place to store it.”  That was the last time Carpenter or Head
ever saw the flex connector.  At trial, Barron testified that he created
handwritten notes about the allegedly faulty flex connector when it was
removed.  He specifically recalled that the flex connector was manufactured by
Titeflex; however, when asked whether he still had his notes from that day,
Barron stated:  “I don’t have the notes stating it [the flex connector] was
actually Titeflex, no, sir.”  Photographs of the alleged faulty flex connector
were admitted at trial, and Barron admitted that none of the photographs
indicated that the flex connector was indeed manufactured by Titeflex.  The
flex connector was never produced by PSI; instead, Barron asserted that PSI’s
attorneys took the flex connector and then submitted the flex connector to
PSI’s expert, David Hendrix.  Once Head filed suit, Hendrix was unable to find
the flex connector.

In any event, PSI and ERM
filed documents with the TNRCC on Head’s behalf.[7]  In the
mandatory December 11, 2001 “Release Determination Report Form” that was
prepared, PSI identified the flex connector as the sole source of the leak. 
PSI noted that the connector was replaced.  Further, at the time the report was
generated, PSI revealed that 14,843 gallons of diesel fuel had been recovered
from the “tank cavity” and that 32,000 gallons of “water/diesel/mix” had been
extracted from drainage ditches.  Barron signed the report certifying that PSI
was supervising all site investigation and repair activities in accordance with
accepted industry standards.       

In addition to the TNRCC
report, Morris created a chronology of the leak for the benefit of Barron.[8] 
In his chronology, Morris noted that, among other things, on November 19, 2001,
“[t]he source of the release has now been determined to be from the flex
connector at dispenser #4.  Both diesel tanks were tightness tested and
passed.”  Morris’s chronology was submitted as an attachment to the “Release
Determination Report Form.”    

F.    The
TNRCC’s Response       

While PSI was examining
the underground storage tank system to determine the cause of the leak, Head
contracted with Barron’s other company, ERM, to begin the cleanup effort. 
Representatives of ERM informed the TNRCC of the release, and the TNRCC sent Boots
& Coots, a company specializing in the cleanup of fuel spills, to assist.[9] 
Carpenter stated at trial that he was present during the cleanup; that ERM
appeared to lead the cleanup efforts; and that Boots & Coots employees
reported to ERM.  Shortly thereafter, the fire marshal and other companies
specializing in remediation arrived at the scene to also assist in the
cleanup.  In addition to Boots & Coots, the TNRCC sent a representative,
Paul Cordova, to investigate the leak.[10]  As part
of his investigation, Cordova was required to determine the cause of the leak. 
Cordova testified that the flex connector was the cause of the leak though he
admitted to never having seen the flex connector; instead, Cordova relied
solely on Barron’s statements regarding the cause of the leak.  Cordova also
requested monthly inventory records for the truck stop, though Head was only
able to quickly produce records for a couple months.  Cordova testified that
PSI provided most of the information about the truck stop to the TNRCC and that
it appeared as if PSI was Head’s representative.  

Based on his investigation
of the truck stop’s inventory records and the statements made by PSI, Cordova
issued numerous citations to Head, with some of the violations not pertaining
to the discharge of diesel fuel.[11]  The
citations amounted to over $300,000 in fines assessed against Head; however,
after negotiating with the TNRCC and demonstrating compliance with numerous
regulatory provisions, Head was able to reduce the fines to approximately $30,000,
with half of the fines paid to a charity in the Rio Grande Valley that “dealt
with providing water and sewer services to poor communities.”  Nevertheless, at
the time of trial, Head still operated under a TNRCC enforcement order.[12]

G.   Remediation of
the Leak

Through remediation
efforts, approximately 22,000 gallons of diesel fuel were recovered from
underground, drainage ditches, and other places.  In addition, more than 39,000
gallons of groundwater was extracted because the water contained traces of diesel
fuel.  However, the remediation of the site was an ongoing endeavor.  In
December 2005, more than four years after the initial leak, Head hired Ranger
Environmental Services (“Ranger”) to conduct a compliance audit and to ensure
that Head’s paperwork regarding fuel inventory levels was being done
correctly.  At this time, Ranger was not performing any remediation work for
Head.  Instead, Ranger checked various monitors to ensure that the remediation
efforts were in compliance with TNRCC regulations.  Airey was in charge of the
audit, and when he checked the monitors, he noticed that there was “[a] lot of
diesel fuel in the ground.”  Airey found that there was still about 10.5 feet
of diesel fuel on the groundwater table.  Airey testified that ERM and PSI were
responsible for cleaning up the released diesel fuel at this time. 

Upon Airey’s discovery,
Head hired Ranger to complete the clean-up of the leak.  At the time of trial
on this matter, in October 2008, the site has not been completely remediated,
though the TNRCC remediation order remains in effect.  Airey estimated that the
total cost to complete the remediation to the satisfaction of the TRNCC would
be $509,509.  

H.   Alternative
Theories About the Cause of the Leak and Titeflex’s Involvement

Titeflex’s expert witness,
Bruce W. Pinkston, Ph.D, estimated that the leak first occurred in March 2001,
and continued consistently until discovered in November 2001.  Dr. Pinkston
opined that the leak was slow and probably constituted about five gallons per hour. 
One of Head’s expert witnesses, Sullivan Curran, a consultant and executive
director of the Fiberglass Tank and Pump Institute, testified that the cause of
the leak was PSI’s improper installation of a union at a shear valve, not the
flex connector.  Relying on the deposition testimony of Octavio Pruneda, a
technician for PSI, Curran asserted that PSI improperly cross-threaded the
union in question, which caused a small leak in the system.[13] 
In fact, Pruneda replaced a galvanized union at one of the dispensers after
confirming the presence of a leak.  Curran also testified that PSI had
improperly designed the system using pipes that were too small in diameter for
the ATG system to work properly.  Curran noted that PSI used two-inch pipes for
the system when it should have used three-inch pipes.  The system has a
high-powered, five-horsepower pump that is used to push fuel from the tanks to
the dispensers.  Because the pipes were smaller than what industry standards
require when integrated with a five-horsepower pump, the fuel pressure in the
system was always high and never “dropped below ten PSI [pounds per square
inch]” to allow for the ATG system to detect whether there was a leak in the
system.  

Roy Rodriguez, PSI’s crew
chief during the initial 2001 clean-up of the leak, testified that PSI dug up
the system and tested the system’s flex hoses, which did not reveal any leaks. 
Rodriguez denied taking any portion of the system out of the ground for
testing.  Specifically, Rodriguez did not recall anyone removing a flex
connector from the ground in November 2001, and he did not recall Barron being
present at the truck stop in November 2001, testing the flex connector, or
putting the flex connector in the back of his truck.     

Despite these allegations, PSI
continually asserted that the flex connector was the cause of the leak.  Barron
testified that he was present at the truck stop during the initial stages of
the investigation and clean-up in November 2001.  Barron recalled removing the
alleged faulty flex connector and placing it in the back of his truck so that
it could be tested.  The flex connector was never seen again; however, Barron
made handwritten notes, took pictures of the flex connector, and repeatedly testified
that the flex connector was manufactured by Titeflex, even though the original
system plans did not call for a Titeflex flex connector to be implemented in
the system.  Furthermore, Barron repeatedly certified to the TNRCC that the
cause of the leak was a Titeflex flex connector.  

I.      The
Lawsuits

On February 13, 2006, Head
filed suit against PSI for breach of warranty of fitness, breach of implied
warranty of good and workmanlike services, negligence, and fraudulent
concealment.  Because the lawsuit was filed more than four years after the leak
was discovered in November 2001, Head pleaded the discovery rule.  On October
5, 2006, PSI filed a third-party action against Titeflex, claiming contribution
and indemnity.  PSI claimed that Titeflex had manufactured the faulty flex
connector that caused the leak and subsequently went missing.  PSI’s
contribution claim was premised on a strict liability cause of action, and PSI
claimed that all damages that Head may have sustained were attributable to the
alleged faulty flex connector.  Based on the allegations made by PSI in its
third-party action, Head amended his original petition to include Titeflex as a
defendant.  Head specifically noted that “Titeflex is strictly liable for
damages caused by the defective flex connector.”  Shortly thereafter, Titeflex
answered both PSI and Head’s third-party actions and asserted various
affirmative defenses.

In the meantime, PSI
filed a counterclaim against Head on March 20, 2007, asserting that Head had
breached numerous agreements by failing to pay PSI $57,527.49 for work and
materials provided to the truck stop.[14]  Later,
Titeflex filed a motion for summary judgment, urging that there was no evidence
that the flex connector that PSI asserted was the cause of the leak had been
manufactured by Titeflex.  Essentially, Titeflex argued that there was no
evidence whatsoever to show that it was at fault for the leak.  The trial court
set a date for the hearing on Titeflex’s motion for summary judgment; however,
because both Head and PSI argued that they needed more time to conduct
discovery, especially considering that the alleged faulty flex connector could
not be found, the trial court continued the hearing.[15]

In its designation of
expert witnesses filed on August 20, 2007, PSI identified one expert, Bastiaan
E. Cornelissen, Ph.D, P.E., to opine that all the damages sustained as a result
of the leak were attributable to the alleged faulty flex connector.  However,
after several notices were provided, Dr. Cornelissen never showed up for his
deposition.  Nevertheless, PSI continued to blame the leak on the flex
connector that was purportedly manufactured by Titeflex.

On January 4, 2008,
Titeflex filed a motion for sanctions, alleging that PSI had spoliated evidence
by failing to produce the alleged faulty flex connector.  In its motion,
Titeflex referenced deposition testimony provided by Barron, whereby he
admitted that PSI tested several flex connectors incorporated into the system,
removed the alleged faulty flex connector, and subsequently lost the allegedly
faulty flex connector, thus making it impossible to determine if the flex
connector was defective and whether Titeflex had indeed manufactured the part. 
Titeflex sought to exclude all evidence tending to show that any product
manufactured or sold by Titeflex was defective, and it requested an instruction
to the jury on spoliation.  Head also filed a motion for sanctions against PSI,
arguing that PSI had intentionally destroyed crucial evidence, i.e., the
alleged faulty flex connector.  Head requested that the trial court consider
the full range of sanctions, up to and including the striking of PSI’s
pleadings and rendering a default judgment.  

            PSI responded to both Titeflex and
Head’s motions for sanctions by blaming Head’s delay in bringing suit and PSI’s
engineering consulting firm and lab for the loss of the flex connector.[16] 
PSI argued that it had made numerous efforts to recover the flex connector,
even though more than six years had elapsed since the flex connector was
allegedly removed from Head’s underground storage tank system.  PSI further
argued that it did not deliberately destroy evidence; that it had not engaged
in culpable or negligent conduct with respect to the flex connector; and that
it did not have a duty to keep the flex connector once the limitations period
expired.  As a result, PSI did not believe that sanctions or a spoliation
instruction was warranted.    

            While Titeflex’s motion for summary
judgment and the motions for sanctions were pending, Head non-suited all his
claims against Titeflex on March 7, 2008, based on the lack of evidence
demonstrating that Titeflex had manufactured the flex connector that PSI
contended was the cause of the leak.  PSI, however, continued to maintain its
indemnity claims against Titeflex.  PSI later filed its first amended answer,
defenses, and cross-claim.  In this filing, PSI generally denied all of Head’s
claims; argued that Head was contributorily negligent in causing the leak;
designated Titeflex, among others, as responsible third parties under chapter
82 of the civil practice and remedies code, see Tex. Civ. Prac. & Rem. Code Ann. §§ 82.001-.008 (West
2011); and asserted various affirmative defenses, including statute of
limitations.    

In response, Titeflex filed
a counterclaim against PSI, contending that it owed PSI no duty to indemnify. 
Titeflex further contended that PSI was an assembler of a finished product and
that Titeflex was an innocent seller under chapter 82 of the civil practice and
remedies code, see id.; thus, PSI was obligated to indemnify Titeflex
for “all past and future costs of court, reasonable expenses, and reasonable
and necessary attorney’s fees which were expended in defense of this action and
in prosecution of this demand for indemnity.”  Titeflex also argued that there
was no evidence indicating that a Titeflex flex connector was used in Head’s
underground storage tank system.  Titeflex also re-urged its request for
sanctions against PSI. 

Head, meanwhile, amended
his petition several times.  In his sixth amended petition, his live pleading,
Head asserted claims against PSI for breach of implied warranty of good and
workmanlike services, negligence, fraud, breach of fiduciary duty, fraudulent
concealment, and breach of contract.  Head also alleged that PSI was strictly
liable for the defective ATG system, which “did not work at the system’s
required capacity.”  Head requested damages for:  (1) remediation; (2) TNRCC
fines and penalties; (3) lost revenues as a result of the lines being shut down
due to system failures; (4) the cost of replacing the failed system; and (5)
the cost of replacing the 20,000 gallons of lost diesel fuel at $1.50 per
gallon.  In addition, Head asked for attorney’s fees and uncapped punitive
damages against PSI for allegedly “us[ing] workers who were not qualified for
[the] work that was performed, regularly falsif[ying] work description sheets
and intentionally cover[ing] up the real causes of the leak and resulting
damages.”  Head further alleged that PSI violated section 32.46 of the Texas
Penal Code for securing the execution of documents by deception.  See Tex. Penal Code Ann. § 32.46 (West
Supp. 2010).  With respect to section 32.46 of the penal code, Head argued that
PSI:  (1) induced Carpenter to sign documents that were sent to the TNRCC,
which falsely stated that the flex connector was the sole cause of the leak;
and (2) withheld documents and evidence from the TNRCC and Head to cover up the
true causes of the leak.  In response to PSI’s limitations defense, Head
asserted that his causes of action were tolled by the discovery rule.

On August 12, 2008, PSI
non-suited its claims against Titeflex.  However, Titeflex continued to seek
costs associated with the matter pursuant to Texas Rule of Civil Procedure 162. 
See Tex. R. Civ. P. 162. 
Shortly before trial commenced, the trial court conducted a hearing on the
pending motions for sanctions.  After hearing arguments from all parties, the
trial court struck PSI’s affirmative defenses, including its limitations defense,
and ruled that a spoliation instruction would be given to the jury.  The
parties’ request for attorney’s fees was carried to the end of the trial.  The
trial court also denied various motions that PSI had filed, including a motion
to strike Head’s third, fourth, fifth, and sixth amended petitions, and a
motion to dismiss or sever Titeflex’s counterclaims.

In October 2008, this
matter proceeded to trial, which ultimately lasted for seven weeks.  At the
conclusion of the evidence, the jury found in favor of Head and Titeflex.  In
particular, the jury ruled in favor of Head’s negligence, breach of contract,
fraud, breach of warranty, and breach of fiduciary duty claims.[17] 
With respect to Titeflex, the jury concluded that PSI was a manufacturer; that
Titeflex was an innocent seller within the context of chapter 82 of the civil
practice and remedies code; and that Titeflex was entitled to indemnity from
PSI, thus allowing for the recovery of costs, expenses, and attorney’s fees
associated with the trial of this matter.  Head elected to recover on the
theories of breach of contract, breach of implied warranty, fraud, and breach
of fiduciary duty.  Head was awarded:  (1) $818,142.38 in actual damages and
$283,178.88 in pre-judgment interest for a sum total of $1,131,321.26; and (2)
$91,500 in attorney’s fees.  Titeflex was awarded:  (1) $382,334 in attorney’s
fees and $68,519.62 in expenses for a sum total of $450,853.62; and (2)
$12,393.55 in court costs.  The jury also concluded that Head breached
agreements with PSI for materials and services provided for the clean-up of the
truck stop; however, according to the jury, Head was excused from complying
with the agreements.[18]   

The trial court signed the
final judgment based on the jury’s findings on January 13, 2009.  Various
post-judgment motions were filed, including motions for judgment non-obstante
verdicto, to disregard the jury’s findings, for a new trial, to modify the
judgment, and for remittitur.  Each of these motions was denied by the trial
court.  PSI timely filed its notice of appeal on April 9, 2009.  See Tex. R. App. P. 26.1(a).  On April 28,
2009, PSI filed a supersedeas bond in the registry of the trial court in the
amount of $1,037,737, or fifty percent of PSI’s net worth as expressed by
Barron.[19]  See
id. at R. 24.2(a)(1)(A); see also Tex.
Civ. Prac. & Rem. Code Ann. § 52.006(b)(1) (West 2008).  This appeal
followed.

II.           
The
Trial Court’s Sanctions

By its first issue, PSI
challenges the trial court’s imposition of sanctions.  PSI characterizes the trial
court’s sanctions as death penalty sanctions and specifically argues that they
violate the test set forth in Transamerican Natural Gas Corporation v.
Powell, 811 S.W.2d 913 (Tex. 1991).  PSI contends that there is no
relationship between the conduct, the offender, and the sanction and that the
sanctions were excessive.  Head responds that the trial court’s sanctions do
not violate the Transamerican standard because there is a relationship
between PSI’s conduct and the sanction imposed and because the sanctions were
not excessive.

Specific as to the trial
court’s spoliation instruction, PSI argues that it had no duty to retain the
flex connector longer than the applicable limitations period; that the loss of
the flex connector did not cause any prejudice; and that the instruction
“nudged the jury against PSI.”  Head counters by arguing that PSI had a duty to
preserve the flex connector because PSI knew that a lawsuit would likely arise
from the incident and that the flex connector was a key piece of evidence.  He asserts
that PSI’s failure to preserve the flex connector prejudiced Head “because he
was unable to determine with certainty liability, causation[,] and fault.”  

A.   Standard of
Review and Applicable Law

We review a trial court’s
imposition of sanctions under an abuse of discretion standard.  Cire v.
Cummings, 134 S.W.3d 835, 838 (Tex. 2004).  A trial court abuses its
discretion when its ruling is arbitrary and unreasonable and without reference
to any guiding rules and principles.  Id. at 838-39.  In conducting our
review, we are not limited to a review of the “sufficiency of the evidence” to
support the trial court’s findings; rather, we make an independent inquiry of
the entire record to determine if the trial court abused its discretion by
imposing the sanction.  Daniel v. Kelley Oil Corp., 981 S.W.2d 230, 234
(Tex. App.–Houston [1st Dist.] 1998, pet. denied) (op. on reh’g).  Thus, we are
not limited to considering only the specific violation committed; we may
consider other matters that have occurred during the litigation.  Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241 (Tex. 1985); see
Hartford Acc. & Indem. Co. v. Abascal, 831 S.W.2d 559, 561 (Tex.
App.–San Antonio 1992, orig. proceeding).

            Rule of civil procedure 215.2 allows a
trial court to enter “just” sanctions for a party’s failure to comply with a
discovery order or request.  Tex. R.
Civ. P. 215.2; see Cire, 134 S.W.3d at 839; Response Time,
Inc. v. Sterling Commerce (N. Am.), Inc., 95 S.W.3d 656, 660 (Tex.
App.–Dallas 2002, no pet.).  Among the prescribed sanctions contained in rule
215.2 are:  (1) an order charging expenses for discovery and court costs; and
(2) the striking of pleadings and defenses.  Tex.
R. Civ. P. 215.2(b)(2), (b)(4)-(5).  Any sanction that adjudicates a
claim or precludes the presentation of the merits of the case constitutes a
“death penalty” sanction.  See Chrysler Corp. v. Blackmon, 841 S.W.2d
844, 845 (Tex. 1992); see also De Los Santos v. Johnson, No.
13-07-00502-CV, 2008 Tex. App. LEXIS 6841, at *8 (Tex. App.–Corpus Christi Aug.
28, 2008, pet. denied) (mem. op.); In re Fina Oil & Chem. Co., No. 13-98-00640-CV,
1999 Tex. App. LEXIS 1751, at **36-37 (Tex. App.–Corpus Christi Mar. 11, 1999,
orig. proceeding) (not designated for publication) (noting that the striking of
a party’s affirmative defense as a sanction precludes the defendant from going to
trial on the merits of that defense and, thus, should be tested according to
the standards applied to the striking of any other pleading).  

The Supreme Court of
Texas in Transamerican developed a two-part test for courts to apply
when determining whether a sanction is “just.”  811 S.W.2d at  917.  First,
there must be a direct nexus among the offensive conduct, the offender, and the
sanction imposed.  Spohn Hosp. v. Mayer, 104 S.W.3d 878, 882 (Tex. 2003)
(citing Transamerican, 811 S.W.2d at 917).  A “just” sanction must be
directed against the abuse and toward remedying the prejudice caused to the
innocent party, and the sanction should be visited upon the offender.  Id.

            Second, “just” sanctions must not be
excessive.  Transamerican, 811 S.W.2d at 917.  That is, a sanction
imposed for discovery abuse should be no more severe than necessary to satisfy
its legitimate purposes, which includes securing compliance with discovery
rules, deterring other litigants from similar misconduct, and punishing
violators.  Id.; see Spohn Hosp., 104 S.W.3d at 882; Blackmon,
841 S.W.2d at 849.  For this reason, the supreme court requires courts to
consider less stringent sanctions and whether such lesser sanctions would fully
promote compliance.  Transamerican, 811 S.W.2d at 917; see Cire,
134 S.W.3d at 839; Spohn Hosp., 104 S.W.3d at 882.

            Discovery sanctions cannot be used to
adjudicate the merits of a party’s claims or defenses, unless a party’s
hindrance of the discovery process justifies a presumption that the party’s claims
or defenses lack merit.  Transamerican, 811 S.W.2d at 918.  However, if
a party refuses to produce material evidence, despite the imposition of lesser
sanctions, the trial court may presume that the asserted claim or defense lacks
merit and dispose of it.  Id.  Sanctions which are so severe as to
preclude presentation of the merits of the case should not be assessed absent a
party’s flagrant bad faith or a party’s callous disregard for the
responsibilities of discovery under the rules.   Id. (citing Nat’l
Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 642-43 (1976) (per
curiam)).

A “hearing on the motion
for sanctions [is] akin to a nonjury trial,” in which “the trial court is the
judge of the credibility of the witnesses and of the weight to be given their
testimony, since the judge has the opportunity to observe the demeanor of the
witnesses on the stand and may believe all, none, or part of the witnesses’
testimony.”  “In determining whether a trial court has abused its discretion
[in a sanctions appeal], we are required to view the evidence in the light most
favorable to the trial court’s action and to indulge every legal presumption in
favor of the judgment.”  Vaughn v. Tex. Employment Comm’n, 792 S.W.2d
139, 143 (Tex. App.–Houston [1st Dist.] 1990, no writ) (citing Parks v. U.S.
Home Corp., 652 S.W.2d 479, 485 (Tex. App.–Houston [1st Dist.] 1983, writ
dism’d)).  Further, reasonable “inferences may be drawn from actual facts
proved” by the trier of the facts.  Beazley v. McEver, 238 S.W. 949, 952
(Tex. Civ. App.–Dallas 1922, no writ).

A.   The Trial
Court’s Spoliation Instruction

"A spoliation
instruction is an instruction given to the jury outlining permissible
inferences they may make against a party who has lost, altered, or destroyed
evidence." Tex. Elec. Coop. v. Dillard, 171 S.W.3d 201, 208 (Tex.
App.–Tyler 2005, no pet.) (citing Brewer v. Dowling, 862 S.W.2d 156, 159
(Tex. App.–Fort Worth 1993, writ denied)). The use of a spoliation instruction
is generally limited to two circumstances:  (1) the deliberate destruction of
relevant evidence; and (2) the failure of a party to produce relevant evidence
or to explain its non-production.  Wal-Mart Stores, Inc. v. Johnson, 106
S.W.3d 718, 721 (Tex. 2003) (citing Anderson v. Taylor Publ'g Co., 13
S.W.3d 56, 61 (Tex. App.–Dallas 2000, pet. denied)).[20] 
Under the first circumstance, a party who has deliberately destroyed evidence
is presumed to have done so because the evidence was unfavorable to its case.  Id.
at 721-22 (citing Williford Energy Co. v. Submergible Cable Servs., Inc.,
895 S.W.2d 379, 389-90 (Tex. App.–Amarillo 1994, no writ); Brewer, 862
S.W.2d at 159).  Under the second circumstance, the presumption arises because
the party controlling the missing evidence cannot explain its failure to
produce it.  Id. at 722 (citing Watson v. Brazos Elec. Power Coop.,
Inc., 918 S.W.2d 639, 643 (Tex. App.–Waco 1996, writ denied)).  "The
presumption does not apply when documents are merely lost."  Cresthaven
Nursing Residence v. Freeman, 134 S.W.3d 214, 227 (Tex. App.–Amarillo 2003,
no pet.) (citing Williford Energy Co., 895 S.W.2d at 389-90); Brewer,
862 S.W.2d at 160.  A trial court may be guided by the following three factors
in determining whether a spoliation presumption is justified:  (1) whether
there was a duty to preserve evidence; (2) whether the alleged spoliator either
negligently or intentionally spoliated evidence; and (3) whether the spoliation
prejudiced the nonspoliator's ability to present its case or defense.  Trevino
v. Ortega, 969 S.W.2d 950, 954-55 (Tex. 1998) (Baker, J., concurring)[21];
Whirlpool Corp. v. Camacho, 251 S.W.3d 88, 102 (Tex. App.–Corpus Christi
2008), rev'd on other grounds, 298 S.W.3d 631 (Tex. 2009).

Before any failure to
produce material evidence may be viewed as discovery abuse, the opposing party
must establish that the non-producing party had a duty to preserve the evidence
in question.  Dillard, 171 S.W.3d at 209 (citing Johnson, 106
S.W.3d at 722).  There must be a sufficient foundational showing that the party
who destroyed the evidence had notice both of the potential claim and of the
evidence’s potential relevance thereto.  Id. (citing Johnson, 106
S.W.3d at 722).  An objective test for anticipation of litigation is whether a
reasonable person would conclude from the severity of the accident and other
circumstances surrounding it that there was a substantial chance for
litigation.  Id. (citing Johnson, 106 S.W.3d at 722).  “A party
should not be able to subvert the discovery process and the fair administration
of justice simply by destroying evidence before a claim is actually filed.”  See
Trevino, 969 S.W.2d at 955 (Baker, J., concurring).         

In this case, the trial
court included the following spoliation instruction in the charge:

You, the jury, are instructed that Petroleum Solutions,
Inc. destroyed, lost, or failed to produce to this Court material evidence that
by law should have been produced as evidence for your deliberations.  You are
further instructed you may, but are not required to presume this evidence is
unfavorable to Petroleum Solutions, Inc. 

 

PSI argues that it did not have a duty to preserve
evidence ad infinitum.  Specifically, PSI contends that it did not have
to preserve the flex connector past November 2005, the date in which PSI
asserts the limitations period expired.  PSI’s argument, however, is belied by
Barron’s testimony and Neally’s affidavit.  In his testimony, Barron stated
that the flex connector was the cause of the leak and that it was removed from
the underground storage tank system by PSI employees and placed in the back of
Barron’s pickup truck in November 2001.  Moreover, Barron admitted that he
anticipated that he would be sued for the leak when he arrived at the scene of
the November 2001 incident.  Carpenter consented to Barron removing the flex
connector from the premises for safekeeping and possible testing.  Neally
averred that Barron gave the flex connector to her in February 2002.  She then
sent the flex connector to Hendrix, PSI’s expert, for testing.  Hendix examined
the flex connector and sent PSI a bill for the examination in September 2002. 
The flex connector was never returned, and PSI alleges that it was unable to
contact Hendrix to instruct him to return the flex connector.  

Based on Barron and
Neally’s statements alone, it is clear that since February 2002, PSI failed to
preserve the flex connector.  Even if we were to accept PSI’s argument that it
only had a duty to preserve the flex connector until November 2005, the
evidence is clear that PSI had not done so since turning the flex connector
over to one of its agents, Neally, in February 2002.  Moreover, although PSI argues
that the flex connector was lost, a reasonable person could conclude that PSI failed
to preserve the evidence given the fact that Hendrix conducted an examination
of the flex connector and demanded payment for the examination, yet failed to
preserve the evidence once the examination was complete.  The foregoing
undermines any argument that the flex connector was merely lost.  

Barron testified and PSI
represented throughout the litigation of this case that the cause of the leak
was the flex connector.  For the majority of the litigation, PSI represented
that the flex connector was manufactured by Titeflex.  PSI’s failure to
preserve the flex connector significantly prejudiced both Head and Titeflex. 
Head was unable to determine with certainty liability, causation, and fault for
the enormous leak of diesel fuel.  Head was forced to rely solely on PSI’s
determination of the cause of the leak, the licensed contractor who originally
installed the underground storage tank and ATG systems and whose president
anticipated being sued once the leak was discovered.  Head was precluded from
obtaining a second opinion about the cause of the leak from another licensed
contractor and was induced to file suit against Titeflex because of PSI’s
allegations.  Cordova testified that it would have been a violation of state
regulations if Head had independently conducted an investigation of the
underground storage tank system without the assistance of a licensed contractor
like PSI.  Thus, Head was at PSI’s mercy.  

Titeflex was also
prejudiced by PSI’s failure to preserve the flex connector because the part
itself was the basis of Titeflex’s liability.  Barron testified that he created
handwritten notes stating that the flex connector was manufactured by Titeflex,
yet he failed to produce those notes.  In addition, Barron’s photographs of the
flex connector failed to demonstrate that the flex connector had indeed been
manufactured by Titeflex.  Had Head and Titeflex been given the opportunity to
examine the flex connector, they likely would have been able to easily
determine whether Titeflex was the manufacturer of the part and whether the
part was defective.  Moreover, had PSI produced the flex connector, it is very
likely that Titeflex would not have been involved in this lawsuit from the
beginning.  Essentially, the flex connector was a key piece of evidence to both
Head and Titeflex, and PSI’s failure to produce the part prejudiced both
parties significantly.  

Based on the foregoing,
we conclude that a reasonable person would have deduced from the severity of
the 20,000-gallon diesel fuel leak and other circumstances surrounding the leak
that there was a substantial chance for litigation, especially considering
Barron admitted as much at trial.  See Johnson, 106 S.W.3d at 722; see
also Dillard, 171 S.W.3d at 209.  Further, because the flex connector was a
central piece of evidence in determining the actual cause of the leak and who
was at fault, it was reasonable to conclude that PSI was on notice of its
potential relevance.  See Johnson, 106 S.W.3d at 722; see also
Dillard, 171 S.W.3d at 209.  We further conclude that Head and Titeflex
both demonstrated that they were significantly prejudiced by PSI’s failure to
produce the flex connector.  In any event, PSI blames its attorneys, insurance
company, and Hendrix for its inability to produce the flex connector.

A
spoliator can defend against an assertion of negligent or intentional
destruction by providing other explanations for the destruction.  For example,
if the destruction of the evidence was beyond the spoliator’s control or done
in the ordinary course of business, the court may find that the spoliator did
not violate a duty to preserve evidence.  Importantly though, when a party’s
duty to preserve evidence arises before the destruction or when a policy is at
odds with a duty to maintain records, the policy will not excuse the obligation
to preserve evidence.

 

Trevino, 969 S.W.2d at 957 (Baker, J.,
concurring) (emphasis added).  As we have explained above, PSI had a duty to
preserve the flex connector.  The fact that PSI was not requested to produce
the flex connector until several years later when the lawsuit was filed is
inconsequential because the evidence establishes that the part was missing
since February 2002, which was well within the governing limitations period.  See
id.

B.   The Trial
Court’s Striking of PSI’s Affirmative Defenses

With regard to the trial
court’s striking of PSI’s affirmative defenses, PSI asserts that the sanctions
violate the Transamerican standard and are excessive.  First, PSI states
that the trial court failed to articulate a connection between the alleged
spoliation—the failure to produce the alleged faulty flex connector—and the
striking of PSI’s affirmative defenses.  In support of this statement, PSI,
once again, suggests that it did not have a duty to preserve the evidence once
the limitations period expired while citing to our opinion in Thomas v.
State.  226 S.W.3d 697, 710 (Tex. App.–Corpus Christi 2007, pet. dism’d)
(stating that “the primary purpose of a statute of limitations—ensuring that a
defendant is placed on notice of claims within a reasonable time, when evidence
and witnesses are available . . . ”).  However, as we have previously
concluded, PSI had a duty to preserve the alleged faulty flex connector and PSI’s
argument is belied by the fact that the part has been lost since February 2002,
a date which was clearly within the limitations period that PSI argues applies. 
PSI withheld the production of evidence that was crucial to this case and
engaged in numerous actions, as we detail later, designed to minimize its fault
in this matter.  In addition, PSI moved for summary judgment based upon
limitations, even though liability in this case centered on PSI’s explanation
for the cause of the leak—the alleged faulty flex connector—and PSI failed to
produce the part.

Second, PSI contends that
it should not be punished because its expert lost the flex connector.  See
In re Barnes, 956 S.W.2d 746, 748 (Tex. App.–Corpus Christi 1997, orig.
proceeding) (“Respondent’s order extinguished Relators’ lawsuit because their
counsel did not file verified responses to interrogatories when he had
represented to Respondent and opposing counsel that the verifications would be
forthcoming.  This order had the effect of punishing Relators for the conduct
of their counsel. . . .  There was no evidence . . . that Relators themselves
were doing anything to thwart the discovery process.”); see also Richmond
Condos. v. Skipworth Commercial Plumbing, Inc., 245 S.W.3d 646, 662 (Tex.
App.–Fort Worth 2008, pet denied) (holding that, based on the facts in the
case, a sanction against the client “would be unfair and improper because it
would have punished [defendant] for a transgression that it did not commit and
for which it bore no responsibility”).

With regard to this
contention, we first note that the Skipworth Commercial Plumbing court, citing
to Transamerican, stated that “a lawyer cannot shield his client from
sanctions; a party must bear some responsibility for its counsel’s discovery
abuses when it is or should be aware of counsel’s conduct and the violation of
discovery rules.”  245 S.W.3d at 661 (citing Transamerican, 811 S.W.2d
at 917).  Therefore, we disagree with PSI’s intimation that the actions of its
lawyers in having the flex connector tested shielded PSI from all sanctions. 
The record reflects that Barron was aware of the fact that Neally gave the flex
connector to Hendrix for testing and that Hendrix was unable to produce the
flex connector since February 2002.  Therefore, PSI cannot credibly assert that
it was unaware of the non-production of the flex connector and simply place
blame at the feet of its lawyers.  Next, and perhaps more importantly, we note
that in considering the propriety of a trial court’s sanctions, we are not limited
to only considering the specific violation committed; we may consider other
matters that occurred during the litigation.  See Downer, 701 S.W.2d at
241; see also Abascal, 831 S.W.2d at 561.  PSI has engaged in repeated
attempts to minimize its fault in this matter, as evidenced by:  (1) PSI
sending Morris to instruct Obregon to re-create inventory records using
misleading calculations to show that Head was not diligent in detecting the
leak; (2) Barron testifying that he removed the alleged faulty flex connector
from the premises, while Rodriguez, the crew-chief, denying that he saw Barron
do such a thing; (3) blaming the cause of the leak on Titeflex, the alleged
manufacturer of the flex connector, even though no evidence existed to
implicate Titeflex; and (4) Corneilissen failing to attend his deposition when
he was the sole expert designated to opine that the cause of the leak was the
flex connector.  We believe that PSI engaged in these actions because Barron
anticipated being sued once he was informed about the leak.  

Given these actions, we
cannot say that the trial court abused its discretion in concluding that PSI,
rather than its lawyers, should be sanctioned.  See Mayer, 104 S.W.3d at
882 (noting that a “just” sanction should be designed to remedy the prejudice
caused to the innocent party and visited upon the offender).  Moreover, based
on this evidence, we believe that there is a direct relationship between the
striking of PSI’s affirmative defense and PSI’s numerous deceptions in this case. 
See Transamerican, 811 S.W.2d at 917.

Finally, PSI asserts that
the sanctions imposed were excessive when considering that a spoliation
instruction was also given and that the trial court should have considered
lesser sanctions.  PSI is correct in stating that the supreme court requires
that a trial court consider less stringent measures before settling on severe
sanctions.  See Mayer, 104 S.W.3d at 883 (citing Transamerican,
811 S.W.2d at 917).  However, “[c]ase determinative sanctions may be imposed in
the first instance only in exceptional cases when they are clearly justified
and it is fully apparent that no lesser sanctions would promote compliance with
the rules.”  GTE Comm’cns Sys. Corp. v. Tanner, 856 S.W.2d 725, 729
(Tex. 1993) (orig. proceeding); Transamerican, 811 S.W.2d at 919; see
In re Zenergy, Inc., 968 S.W.2d 1, 9 (Tex. App.–Corpus Christi 1997, orig.
proceeding); Marshall v. Ryder Sys., Inc., 928 S.W.2d 190, 197 (Tex.
App.–Houston [14th Dist.] 1996, writ denied).  In fact, “[s]anctions which are
so severe that they preclude presentation on the merits should not be assessed
absent a party’s bad faith or counsel’s flagrant disregard for the
responsibilities of discovery under the rules.”  In re Zenergy, Inc.,
968 S.W.2d at 9; see Blackmon, 841 S.W.2d at 849.  Ultimately, as
described by the Transamerican court, “[t]he punishment should fit the
crime.”  811 S.W.2d at 917.  

Based on the aforementioned
acts engaged in by PSI, we do not believe that the imposition of lesser
sanctions would have promoted compliance with the discovery rules.  See
Tanner, 856 S.W.2d at 729; Transamerican, 811 S.W.2d at 919; In
re Zenergy, Inc., 968 S.W.2d at 9; Marshall, 928 S.W.2d at 197.  In
fact, to date, PSI cannot produce the flex connector which it alleges is the
cause of the leak, and PSI has not adequately explained what lesser sanctions
could have been imposed to promote compliance.  Considering all of the
circumstances in this case, we conclude that the trial court was justified in
concluding that PSI’s actions amounted to bad faith and warranted the
imposition of more severe sanctions.  See Blackmon, 841 S.W.2d at 849; In
re Zenergy, Inc., 968 S.W.2d at 9; see also Downer, 701 S.W.2d at
241; Abascal, 831 S.W.2d at 561.  Furthermore, considering all of the
evidence in the light most favorable to the trial court’s judgment, we cannot
say that the trial court abused its discretion in imposing sanctions and in
issuing the spoliation instruction.  See Cire, 134 S.W.3d at 838; Trevino,
969 S.W.2d at 953 (stating that trial courts have broad discretion to sanction
for evidence spoliation, including the imposition of death penalty sanctions); Daniel,
981 S.W.2d at 234; see also Vaughn, 792 S.W.2d at 143; Parks,
652 S.W.2d at 485.  In essence, we conclude that the sanctions imposed and the
spoliation instruction given by the trial court “fit the crime” and were not
excessive.  See Transamerican, 811 S.W.2d at 917.  

The dissent states that the
trial court’s sanction of striking PSI’s affirmative defenses was so severe as
to violate the Transamerican standard.  See id.  However, we note
that the trial court’s sanctions did not preclude PSI from challenging
liability on Head’s claims by presenting witnesses and evidence in support
thereof.  Despite the sanctions, Head was still required to prove his causes of
actions at trial.  Thus, this was not an instance where the trial court struck
all of the pleadings of the spoliator, including the spoliator’s answer, and
conducted a trial solely on damages.  As such, we believe that the sanctions
imposed were of a lesser nature than those that could have been imposed.  See
id. at 918; see also Tex. R.
Civ. P. 215.2(b)(5) (allowing the trial court to strike pleadings or
parts thereof, dismiss actions with or without prejudice, or render a default
judgment for discovery abuses).  Therefore, based on the foregoing, we overrule
PSI’s first issue.

III.          
Limitations

In its second issue, PSI argues
that Head’s claims were barred by limitations.  Specifically, PSI argues that
Head’s claims accrued when the leak first occurred, and that the discovery rule
and fraudulent concealment doctrine do not apply or do not serve to toll the
limitations period such that Head’s lawsuit was timely.  Head counters that
PSI’s limitations defense was properly struck as a sanction and because
limitations must be pleaded and proved, PSI is not entitled to a judgment on
its limitations affirmative defense.

            The statute of limitations is an affirmative
defense.[22]  Tex. R. Civ. P. 94; Fontenot
Petro-Chem. & Mar. Servs., Inc. v. LaBono, 993 S.W.2d 455, 458 (Tex.
App.–Corpus Christi 1999, pet. denied) (citing Woods v. William M. Mercer,
Inc., 769 S.W.2d 515, 517 (Tex. 1988)).  It is the defendant’s burden to
plead and prove its statute of limitations affirmative defense, otherwise it is
waived.  See LaBono, 993 S.W.2d at 458; Tuttlebee v. Tuttlebee,
702 S.W.2d 253, 256 (Tex. App.–Corpus Christi 1985, no writ); see also
Devlin-Weinheimer v. Weinheimer, No. 13-08-00546-CV, 2009 Tex. App. LEXIS
9258, at **13-14 (Tex. App.–Corpus Christi Dec. 3, 2009, pet. denied) (mem.
op.).  PSI pleaded its limitations affirmative defense; however, the trial
court struck this defense, among others, in its sanctions order.  Because the
trial court struck PSI’s limitations defense and because we have concluded that
the trial court did not abuse its discretion in issuing its sanctions order,
PSI did not plead and prove its affirmative defense of limitations.  See
LaBono, 993 S.W.2d at 458; Tuttlebee, 702 S.W.2d at 256; see also
Weinheimer, 2009 Tex. App. LEXIS 9258, at **13-14.  Moreover, this Court
has held “that a mere general denial will not place in issue the affirmative
defense of limitations which must, pursuant to Rule 94 [of the Texas Rules of
Civil Procedure], be specially pleaded.”  Wynn v. Wynn, 587 S.W.2d 790,
792 (Tex. Civ. App.–Corpus Christi 1979, no writ).  Accordingly, we overrule
PSI’s second issue.  

IV.         
Head’s
Causes of Action

By its third through seventh
issues, PSI argues that the evidence supporting the jury’s verdict as to Head’s
causes of action is insufficient.

A.   Standard of
Review

An appellate court will
sustain a legal sufficiency or "no-evidence" challenge if the record
shows:  (1) the complete absence of a vital fact; (2) the court is barred by
rules of law or evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the evidence offered to prove a vital fact is no more
than a scintilla; or (4) the evidence establishes conclusively the opposite of
the vital fact.  City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex.
2005).  In conducting a legal sufficiency review, we must consider the evidence
in the light most favorable to the jury's verdict and indulge every reasonable
inference that supports it.  Id. at 821-22; Harris County v.
Vernagallo, 181 S.W.3d 17, 24 (Tex. App.–Houston [14th Dist.] 2005, no
pet.); Prairie View A&M Univ. v. Brooks, 180 S.W.3d 694, 705 (Tex.
App.–Houston [14th Dist.] 2005, no pet.).  The evidence is legally sufficient
if it would enable reasonable and fair-minded people to reach the decision
under review.  See City of Keller, 168 S.W.3d at 827-28; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705.  We must credit favorable
evidence if a reasonable trier of fact could have, and disregard contrary
evidence unless a reasonable trier of fact could not have.  Ingram, 288
S.W.3d at 893; Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271
S.W.3d 238, 248 (Tex. 2008); City of Keller, 168 S.W.3d at 827.  The
trier of fact is the sole judge of the witnesses' credibility and the weight to
be given their testimony.  City of Keller, 168 S.W.3d at 819; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705. Moreover, in reviewing the
sufficiency of the evidence, we may not substitute our own judgment for that of
the trier of fact, even if we would reach a different answer on the evidence.  See
Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998); see also
Scoggins Constr. Co. v. Dealers Elec. Supply Co., No. 13-06-00368-CV,
2009 Tex. App. LEXIS 8171, at *9 (Tex. App.–Corpus Christi Oct. 22, 2009, pet.
denied) (mem. op. on remand).

In reviewing the factual
sufficiency of the evidence, we consider and weigh all of the evidence in the
case and set aside the verdict and remand the cause for a new trial if we
conclude, viewing the evidence in a neutral light, that the verdict is so
against the great weight and preponderance of the evidence as to be manifestly
unjust, regardless of whether the record contains some "evidence of
probative force" in support of the verdict.  See Golden Eagle Archery,
Inc. v. Jackson, 116 S.W.3d 757, 761-62 (Tex. 2003); see also Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).  The evidence
supporting the verdict is to be weighed along with the other evidence in the
case, including that which is contrary to the verdict.  Jackson, 116
S.W.3d at 761-62.  If we determine that the evidence supporting the jury's
verdict is not supported by factually sufficient evidence, we must "detail
the evidence relevant to the issue" and "state in what regard the
contrary evidence greatly outweighs the evidence in support of the
verdict."  Dow Chem Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001)
(per curiam).

In the context of a jury
trial, the sufficiency of the evidence is reviewed in the light of the charge
submitted if no objection is made to the charge.  Romero v. KPH
Consolidation, Inc., 166 S.W.3d 212, 221 (Tex. 2005); Wal-Mart Stores,
Inc. v. Sturges, 52 S.W.3d 711, 715 (Tex. 2001).  Here, although PSI
expressed many concerns with the jury charge, it appears from the record that
the concerns were resolved in PSI’s favor in the charge given to the jury, and
the trial court, therefore, ever ruled on its objections, if any.  Thus, we
review the evidence under the law as set out in the jury charge.  See Romero,
166 S.W.3d at 221; see also Sturges, 52 S.W.3d at 715.

B.   Breach of
Fiduciary Duty

In its third issue, PSI argues that
there is no evidence that PSI agreed to be subject to Head’s control; that
there is no evidence that Head controlled the details of PSI’s work; that it
did not owe general fiduciary duties to Head; and that Head failed to prove
damages sustained as the result of the alleged breach of fiduciary duty. 
Essentially, PSI attacks all three elements of Head’s breach of fiduciary duty
cause of action.

1.    Applicable
Law

The charge asked the jury
whether it believed that PSI was an agent of Head.  Agency was defined as:

[A] consensual relationship requiring that an agent-to-be
and a principal-to-be consent to their association with each other.

 

The definition of agency requires as an essential element
that the agent consent to act on the principal’s behalf, as well as subject to
the principal’s control.

 

Performing a duty created by contract may well benefit the
other party but the performance is that of an agent only if the elements of
agency are present.

 

Proof of agency requires a showing that the alleged
principal has the right to assign the alleged agent’s task and the right to
control the means and details of the process to be used to accomplish this
task.

 

The right to veto another’s decisions does not by itself
create the right to give affirmative directives that action be taken, which is
integral to the right of control within an agency relationship.

 

The principal’s power to control the agent distinguishes
principals in agency relationships from those who contract to receive services
provided by persons who are not agents.

 

A relationship is not one of agency unless the agent
consents to act on behalf of the principal, and the principal has the right
throughout the duration of the relationship to control the agent’s acts.

 

The charge further stated that Head must prove
that PSI failed to comply with a fiduciary duty owed to Head by showing:  (1)
the transactions were not fair and were inequitable to Head; (2) PSI did not
make reasonable use of the confidence Head placed in it; (3) PSI failed to act
in the utmost good faith and exercised the most scrupulous honesty toward Head;
(4) PSI placed its own interests above those of Head, which caused a detriment
to Head; and (5) PSI failed to fully and fairly disclose important information
to Head concerning transactions.  See Lundy v. Masson, 260 S.W.3d 482,
501 (Tex. App.–Houston [14th Dist.] 2008, pet. denied) (outlining the essential
elements of a breach of fiduciary duty claim); see also Bradshaw v. Bonilla,
No. 13-08-00595-CV, 2010 Tex. App. LEXIS 662, at *9 (Tex. App.–Corpus Christi
Jan. 28, 2010, pet. denied) (mem. op.).  A plaintiff bears the burden of
proving each element of his breach of fiduciary duty claim.  See Avary v.
Bank of Am., N.A., 72 S.W.3d 779, 792 (Tex. App.–Dallas 2002, pet. denied);
see also SJW Prop. Commerce, Inc. v. Sw. Pinnacle Props., Inc., 328
S.W.3d 121, 154 (Tex. App.–Corpus Christi 2010, pet. filed).

A fiduciary relationship
may arise as a matter of law in certain formal relationships.  See Meyer v.
Cathey, 167 S.W.3d 327, 330 (Tex. 2005) (per curiam); Priddy v. Rawson,
282 S.W.3d 588, 600 (Tex. App.–Houston [14th Dist.] 2009, pet. denied); see
also Lundy, 260 S.W.3d at 501; Cotten v. Weatherford Bancshares, Inc.,
187 S.W.3d 687, 698 (Tex. App.–Fort Worth 2006, pet. denied).  However, because
not every relationship involving a high degree of trust and confidence rises to
the stature of a formal fiduciary relationship, the law also recognizes the
existence of an informal or confidential fiduciary relationship.  Meyer,
167 S.W.3d at 330.  An informal fiduciary relationship may arise from a moral,
social, domestic, or purely personal relationship of trust and confidence.  Id.;
see Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp., 823
S.W.2d 591, 594 (Tex. 1992); Priddy, 282 S.W.3d at 600; Cotten,
187 S.W.3d at 698.  The moral, social, domestic, or personal relationship upon
which the informal or confidential relationship is predicated "'must exist
prior to, and apart from the agreement made the basis of the suit.'"  Meyer,
167 S.W.3d at 331 (quoting Schlumberger Tech. Corp. v. Swanson, 959
S.W.2d 171, 177 (Tex. 1997)); Priddy, 282 S.W.3d at 600; see Hubbard
v. Shankle, 138 S.W.3d 474, 483 (Tex. App.–Fort Worth 2004, pet. denied)
("In other words, there must be a preexisting special relationship of
trust and confidence that is betrayed in later dealings.").  A person is
justified in placing confidence in the belief that another party will act in
his best interest only where he is accustomed to being guided by the judgment or
advice of the other party and there exists a long association in a business
relationship as well as a personal friendship.  Hoggett v. Brown, 971
S.W.2d 472, 488 (Tex. App.–Houston [14th Dist.] 1997, pet. denied); see Ins.
Co. of Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998) (providing that
"confidential relationships may arise when the parties have dealt with
each other in such a manner for a long period of time that one party is
justified in expecting the other to act in its best interest"); see
also Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 200 (Tex.
2002) (“The agreement to act on behalf of the principal causes the agent to be
a fiduciary, that is, a person having a duty, created by his undertaking, to
act primarily for the benefit of another in matters connected with his
undertaking.”).  Moreover, mere subjective trust is insufficient to establish a
confidential relationship that gives rise to a fiduciary duty.  Meyer,
167 S.W.3d at 331.

            The relationship between agent and
principal is a fiduciary relationship. Restatement
(Second) of Agency § 1 (1958).  An agency relationship does not depend
upon the express appointment or assent by the principal; rather, it may be
implied from the conduct of the parties.  Orozco v. Sander, 824 S.W.2d
555, 556 (Tex. 1992); see Ross v. Tex. One P'ship, 796 S.W.2d 206, 210
(Tex. App.–Dallas 1990), writ denied per curium, 806 S.W.2d 222 (Tex.
1991); Mercedes-Benz of N. Am., Inc. v. Dickenson, 720 S.W.2d 844, 858
(Tex. App.–Fort Worth 1986, no writ).  An agent is one who is authorized by
another to transact business or manage some affair for him.  Welch v.
Coca-Cola Enters., Inc., 36 S.W.3d 532, 539 (Tex. App.–Tyler 2000, pet.
withdrawn). The existence of an agency relationship may be established by
circumstantial evidence based upon proof of all the facts and circumstances
that shows the relationship of the parties and throws light upon the character
of such relations.  Id. at 540.

2.    Discussion

In this case, the jury concluded
that PSI was Head’s agent and that PSI failed to comply with the fiduciary duty
owed to Head, the principal.[23]  In
particular, the jury found that PSI failed to show that:  (1) the transactions
between the parties were fair and equitable to Head; (2) it made reasonable use
of the confidence that Head placed with it; (3) it acted in the utmost good
faith and exercised the most scrupulous honesty towards Head; (4) it did not
place its interests above Head’s; and (5) it fully and fairly disclosed all
important information to Head concerning the transactions involved in this
case.  

a.    Existence
of a Duty

In challenging the duty
element of Head’s breach of fiduciary duty cause of action, PSI directs us to
Carpenter’s testimony that PSI was simply a “vendor” and that Head simply
“relied on” PSI and argues that the record contains no testimony indicating
that Head controlled PSI’s work.  PSI argues that it acted as an independent
contractor, not as Head’s agent, in installing the underground storage system. 
See First Nat’l Acceptance Co. v. Bishop, 187 S.W.3d 710, 714 (Tex.
App.–Corpus Christi 2006, no pet.) (“The party claiming agency must prove the
principal has both the right to assign the agent’s task and the right to
control the means and details by which the agent will accomplish the task.  The
principal’s extent of control over the details of accomplishing the assigned
task primarily distinguishes the status of agent from that of independent
contractor.”) (citations omitted).  We disagree.

The evidence establishes
that PSI and Head had a long-standing relationship dating back to 1997, when
Head first contracted with PSI to remove the three steel tanks and implement
the new underground storage tank system.  Head continued to use PSI exclusively
to perform work on the underground storage tank system.  In fact, the record
demonstrates that PSI made repairs to the underground storage tank system at
least fifty times from 1997 to 2001.  In October 1999, based on PSI’s
recommendation, Head authorized PSI to install a new ATG system, which was
designed to allow Head to discontinue using the stick method to monitor
inventory levels.  In addition, PSI accepted responsibility for ensuring that
Head’s system was compliant with State rules and regulations.  PSI advised Head
regarding the system’s registration, monthly leak tests, monthly inventory
control, and annual line and leak detector tests.  Carpenter testified that PSI
conducted annual tank tightness and line tightness tests at the direction of
Head so that the truck stop could obtain a State-mandated fuel-delivery
certificate.  Beginning in September 1999, PSI sent Morris to the truck stop to
speak with Head and his employees about compliance issues, including proper
inventory control.

The record also reflects
that PSI repeatedly acted on Head’s behalf with the TNRCC.  PSI filed the
initial application with the TNRCC for the construction of the underground
storage tank system on behalf of Head.  PSI also filed paperwork with the TNRCC
pertaining to the cause and scope of the leak on Head’s behalf, which included
additional calculations and revisions done to the inventory records created by
Obregon.  Furthermore, Barron testified at trial that “I worked for Bill Head,”
thereby intimating that PSI was subject to Head’s control.  Barron himself
executed the “Release Determination Report Form” that was filed with the TNRCC
as the on-site supervisor.  Even Cordova, the TNRCC field investigator, noted
that “[f]rom what I can determine, they [PSI] were representing, providing
information representing Bill Head.”  Carpenter testified that he had some
input in the paperwork sent to the TNRCC, and he was required to sign the
paperwork before it was sent, indicating that he reviewed the paperwork and
assented to the representations made by PSI.  

Once the leak was
detected, PSI agreed to act on behalf of Head in the assessment and remediation
of the leak, in compliance with State regulations.  Carpenter stated that PSI
and ERM were hired to investigate and repair the leak.  He noted that: 
“[w]ell, it was—it was two parties, Environmental Risk Management and Petroleum
Solutions, and Mark [Barron] was involved into it because he—you know, he
wanted to get to the source of the problems, and I put it in their hands . . .
to backtrack and see where it came from.”  Carpenter further noted that the
employees at the truck stop lacked the ability to investigate and repair the
leak; thus, Head relied on PSI and ERM for these tasks.  Barron tested the
tanks and pipes, and after being told about the flex connector, Carpenter
directed PSI to make all necessary repairs to the system to “get online and
back up and pumping [in] as short time as possible.”  

PSI directs us to
Carpenter’s testimony, where he testified that “we [Head] relied on—on them
[PSI] to direct us in the correct direction, as far as what was needed at that
immediate time.”  PSI also notes that Head did not exercise control over the
means of completing the assigned tasks; in fact PSI was left “entirely free to
pursue that assigned task as PSI chose.”  This testimony appears to conflict
with testimony indicating that PSI acted on Head’s behalf during the:  (1)
construction of the underground storage tank system; (2) filing of paperwork
with the TNRCC; (3) testing of the system; (4) investigation of the leak; and
(5) remediation of the leak.  The record contains testimony that Head had input
or exerted control over the means of completing most of the assigned tasks,
especially with regard to the filing of paperwork and interactions with the
TNRCC, and that PSI regularly repaired the system, conducted tests, and ensured
that the system remained in compliance with State regulations and standards;
therefore, we conclude that PSI owed Head a general fiduciary duty.  See
Bishop, 187 S.W.3d at 714; see also Field Measurement Serv., Inc. v.
Ives, 609 S.W.2d 615, 619 (Tex. Civ. App.–Corpus Christi 1980, writ ref’d
n.r.e.) (noting that the fiduciary duty owed by an agent to his principal is
inherent in an agency relationship).  

To the extent that
Carpenter’s testimony indicates that Head relied on PSI and allowed PSI to
pursue assigned tasks as PSI chose, we note that the reconciliation of
conflicting evidence was within the province of the jury, and we must defer to
the jury’s resolution so long as the finding is reasonable.  See City of
Keller, 168 S.W.3d at 819; see also McGalliard v. Kuhlmann, 722
S.W.2d 694, 697 (Tex. 1986) (stating that when presented with conflicting
evidence, the fact-finder may believe one witness and disbelieve others); Ashcraft
v. Lookadoo, 952 S.W.2d 907, 910 (Tex. App.–Dallas 1997, pet. denied)
(noting that the trier of fact is the exclusive judge of the witnesses’
credibility and the weight to be given their testimony).  In concluding that
PSI was Head’s agent, the jury implicitly found that PSI owed Head a fiduciary
duty to act for the benefit of Head and clearly rejected PSI’s assertion that
PSI acted solely as an independent contractor, rather than as Head’s agent,
when completing tasks for Head.  See City of Keller, 168 S.W.3d at 819. 
To the extent that PSI argues that PSI did not owe Head a fiduciary duty
because there were not written contracts for every assigned task, we note that
Texas courts have held that agency relationships may be implied from the
conduct of the parties.  See Orozco, 824 S.W.2d at 556; Ross, 796
S.W.2d at 210; Dickenson, 720 S.W.2d at 858.  

Based on the foregoing, we
conclude that the jury was reasonable in concluding that a fiduciary
relationship existed between PSI and Head.  See Johnson, 73
S.W.3d at 200; Orozco, 824 S.W.2d at 556; Welch, 36 S.W.3d at
540; see also Ross, 796 S.W.2d at 210; Dickenson, 720 S.W.2d at
858.  Given that, we must now analyze the remaining elements of Head’s
breach-of-fiduciary-duty claim.          

b.    Breach of
the Duty and Damages Elements

The jury awarded Head
damages for:  (1) attorney’s fees associated with the defense of the
enforcement action; (2) cost of emergency clean-up of the November 2001 leak;
(3) cost of past remediation of the truck stop; (4) cost of future remediation
of the truck stop; (5) value of the diesel fuel lost as a result of the leak;
and (6) the cost of the ATG system installed by PSI in 1999.  PSI alleges that
“[t]here is no evidence any of these damages were proximately caused by a
breach of fiduciary duty owed by PSI.”  The record indicates otherwise.

At trial, the jury heard
evidence of numerous instances where PSI put its own interest ahead of Head’s
interest.  The most obvious example is PSI’s failure to produce the alleged
faulty flex connector when it insisted in documentation to the TNRCC that the
flex connector under the fourth dispenser was the cause of the leak.  Moreover,
the record reflects several instances where PSI failed to provide Head with a
copy of the records being provided to the TNRCC.  In fact, in one such
instance, Head’s attorneys requested records regarding the installation of the
double-walled fiberglass tanks, records of service and repair work, and PSI
operating manuals, but Morris, a PSI employee, refused to provide the documents
despite having the records in his possession.  In addition, Obregon testified
that PSI sent Morris to assist in revising inventory control records for the
truck stop.  Witnesses noted that Morris instructed Obregon to round-off and
alter figures using gross calculations, rather than net, before reporting
inventory numbers to the TNRCC.[24]  Head’s
experts opined that these figures were altered to minimize PSI’s fault with
respect to the leak and to show that Head was not diligent in discovering the
leak.  Pruneda, another PSI employee, and other witnesses testified that the
real cause of the leak was an improper installation of a union at a shear
valve, rather than the flex connector that Barron blamed at trial and in
paperwork filed with the TNRCC.  This testimony gives rise to an inference that
PSI negligently installed the underground storage tank system and, thus, caused
the leak and the damages associated with discovering, cleaning up, and
remediating the leak.  Furthermore, the record also gives rise to an inference
that PSI employees, namely Barron and Morris, engaged in a coordinated effort
to place blame for the leak at the feet of Head.  Clearly, such actions would
constitute a breach of the fiduciary duty owed by PSI to Head.  See Lundy,
260 S.W.3d at 501; see also Bradshaw, 2010 Tex. App. LEXIS 662, at *9.

The jury also heard
evidence that Cordova relied upon representations made by PSI to complete his
TNRCC investigative report, which served as the basis for the more than
$300,000 in fines assessed against Head.  Cordova admitted that Morris was a
colleague of his at the TRNCC; in fact, Cordova acknowledged that Morris
trained him to be an investigator.  Never at any point during Cordova’s
investigation did PSI intervene on Head’s behalf.  Among the fines assessed
against Head were for failing to do annual testing on the underground piping
and leak detectors.  This testing had been done, but PSI failed to mention that
to Cordova.  Morris failed to tell Cordova that PSI had the installation
records for Head’s system, and Head was subsequently fined for failing to
produce those records.  In addition, Head was fined for failing to correctly label
each underground storage tank, which several witnesses testified was PSI’s
responsibility.  Head also received a fine associated with monthly inventory
control records, and once again, PSI failed to inform Cordova that the ATG
system had been repaired numerous times and often produced faulty readings. 
Though the $300,000 in fines assessed against Head by the TNRCC were reduced,
Head was still forced to pay approximately $30,000 in fines and incurred
significant costs in defending the enforcement action, which required Head to
demonstrate compliance with State rules and regulations, something that PSI
could have and should have done as Head’s agent.

From this evidence, we
conclude that a jury could reasonably infer that PSI breached the fiduciary
duty it owed to Head and that the damages awarded resulted from the breach by
PSI.  See Si Kyu Kim v. Harstan, Ltd., 286 S.W.3d 629, 635 (Tex. App.–El
Paso 2009, pet. denied) (citing Jones v. Blume, 196 S.W.3d 440, 447
(Tex. App.–Dallas 2006, pet. denied)) (stating that breach of fiduciary duty
requires a showing that the breach caused an injury); Punts v. Wilson,
137 S.W.3d 889, 891 (Tex. App.–Texarkana 2004, no pet.)) (same); see also
Wells Fargo Bank, N.A. v. Crocker, No. 13-07-00732-CV, 2009 Tex. App. LEXIS
9791, at *10 (Tex. App.–Corpus Christi Dec. 29, 2009, pet. denied) (noting that
a plaintiff has the burden of proving each element of his breach of fiduciary
duty claim).  As a result, we hold that there exists more than a scintilla of
evidence to support the jury’s findings pertaining to Head’s breach of
fiduciary duty claim.  See City of Keller, 168 S.W.3d at 810.  We
further hold that, after reviewing the evidence in a neutral light, the jury’s
findings as to Head’s breach of fiduciary duty claim is not against the great
weight and preponderance of the evidence as to be manifestly unjust.  See
Golden Eagle Archery, Inc., 116 S.W.3d at 761-62.  PSI’s third issue is
overruled.

C.   Fraud

In its fourth issue, PSI challenges
the jury’s finding that PSI committed fraud against Head.  Specifically, PSI
asserts that there is no evidence of fraud, nor is there evidence that any
possible material misrepresentation caused the damages sustained by Head.  

1.    Applicable
Law

The elements of a cause of
action for fraud are:  (1) that a material representation was made; (2) the
representation was false; (3) when the representation was made, the speaker
knew it was false or made it recklessly without any knowledge of the truth and
as a positive assertion; (4) the speaker made the representation with the
intent that the other party should act upon it; (5) the party acted in reliance
on the representation; and (6) the party suffered injury as a result.  Ernst
& Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex.
2001); Bradford v. Vento, 48 S.W.3d 749, 754-55 (Tex. 2001).  A promise
to do an act in the future constitutes fraud only when made with no intention
of performing the promise at the time the promise was made.  Formosa
Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d
41, 48 (Tex.1998).  The mere failure to perform a contract is not evidence of
fraud.  Id. Fraudulent intent may be established by either direct or
circumstantial evidence, and the subsequent failure to perform the promise,
while not alone dispositive, can be considered with other factors to establish
intent.  Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,
962 S.W.2d 507, 526 (Tex. 1998); Spoljaric v. Percival Tours, Inc., 708
S.W.2d 432, 434-35 (Tex. 1986).

“Pure expressions of
opinion are not actionable.  It has been held that a representation, to be
actionable, must be a representation of a material fact.”  Trenholm v.
Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983); see Prudential Ins. Co. of
Am. v. Jefferson Assocs., Ltd., 896 S.W.2d 156, 163 (Tex. 1995) (“A
statement is not fraudulent unless the maker knew it was false when he made it
or made it recklessly without knowledge of the truth.”).  Moreover, a statement
is regarded as material if “it is important to the party to whom it is made in
making a decision regarding the particular transaction.  Material means a
reasonable person would attach importance to and would be induced to act on the
information in determining his choice of actions in the transaction in
question.”  Burleson State Bank v. Plunkett, 27 S.W.3d 605, 613 (Tex.
App.–Waco 2000, pet. denied) (citing Beneficial Personnel Serv. v. Porras,
927 S.W.2d 177, 186 (Tex. App.–El Paso 1996), vacated and remanded by agreement,
938 S.W.2d 716 (Tex. 1997); Am. Med. Int’l, Inc. v. Giurintano, 821
S.W.2d 331, 338 (Tex. App.–Houston [14th Dist.] 1991, no writ)).

2.    Discussion

Here, the jury was
instructed that:

Fraud occurs when:

 

a.   
a party makes a material misrepresentation,

 

b.   
the misrepresentation is made with knowledge of its falsity or made
recklessly without any knowledge of the truth and as a positive assertion,

 

c.    the
misrepresentation is made with the intention that it should be acted on by the
other party, and

 

d.    the
other party actually and justifiably relies on the misrepresentation and
thereby suffers injury.

 

The
charge defined “[m]isrepresentation” as a “false statement of fact.”

 

            The evidence adduced at trial shows
that PSI made numerous misrepresentations to Head, including the qualities and
characteristics of the underground storage tank system and PSI’s services, the
proper measure for calculating inventory, and the source of the diesel fuel
discharge.  Head testified that representatives from PSI told him that the ATG
system “was supposed to do all the work and should—should alert us whenever we
had a leak” and that the ATG system would allow Head to discontinue stick
readings.  However, the ATG system malfunctioned soon after the date of
installation; in fact, PSI came to repair the ATG system more than fifty times
from 1997 to 2001.  It certainly did not operate as represented.  Although the
leak was not discovered until November 2001, experts opined that the leak
likely began in March 2001.  Moreover, Cordova testified that even though Head
had an ATG system installed, State regulations required that operators continue
to conduct stick readings or engage in other measuring techniques as a back-up
to an automatic tank gauging system, though this fact was never represented to
Head.

            Furthermore, Obregon testified that he
was responsible for compiling monthly inventory records at the truck stop.  In
doing so, Obregon calculated daily inventory totals using net figures generated
by the ATG system, rather than using gross figures, which are not adjusted for
evaporation.  Shortly after the leak was discovered, Morris unexpectedly paid a
visit to the truck stop.  Morris represented to Obregon that State rules and
regulations required that inventory figures be rounded off and expressed in
gross numbers for gallons received in order to calculate daily inventory
amounts.  Because Obregon had used net figures to do his inventory calculations,
Morris instructed Obregon to recreate several months of monthly inventory
control records for the truck stop using gross numbers, though Mark Owens,
PSI’s expert, testified that State rules and regulations require that net
figures be used and that the use of net figures is more accurate for assessing
inventory.

            Additionally, PSI represented to Head
and the TNRCC that the cause of the leak was the flex connector under the
fourth dispenser.  PSI also represented this to the TNRCC on Head’s behalf.  In
fact, Barron signed the discharge determination report as on-site supervisor
conducting the repair work after the leak and noted that the flexible
connection under the fourth dispenser had failed.  However, after representing
the cause of the leak to both Head and the TNRCC, Barron removed the alleged
faulty flex connector from the premises, and the part was never seen again,
thus making it impossible to determine with certainty whether the particular
flex connector that was allegedly removed from the premises was indeed the
cause of the leak.  In any event, PSI’s representations about the cause of the
leak were undermined by testimony at trial.  One of Head’s experts, Curran,
stated that the source of the leak was a union underneath the fourth
dispenser.  Curran based his opinions on, among other things, the testimony of
both Pruneda and Rodriguez.  Pruneda, a technician for PSI, testified that
installers for PSI had improperly cross-threaded the union in question, which
caused a small leak in the system, and warranted replacement.  Moreover, Curran
noted that the design called for pipes that were not large enough in diameter
to reduce pressure in the piping system when combined with the high-powered
pump.  Curran opined that the high pressure in the pump prevented the ATG
system from detecting whether the system was leaking.

In addition to this
testimony, Rodriguez failed to corroborate Barron’s statements regarding the
removal of the flex connector from the premises.  Rodriguez testified that none
of the flex hoses were leaking, and as crew chief during the clean-up, he
denied ever seeing Barron test the alleged faulty flex connector, much less
place the part in the back of his truck to be removed from the premises.  As is
clear from this evidence, PSI made several false representations to Head
throughout the course of their business relationship.           

            As a result of the false
representations made by Morris, Obregon recreated the inventory records for the
truck stop to coincide with Morris’s instructions.  By doing this, the newly
recreated records seemed to suggest that Head failed to notice an obvious leak
in the system.  And the fact that the records were submitted to the TNRCC and
were recreated immediately after the discharge occurred gives rise to an
inference that PSI was attempting to avoid fault for the leak.  This inference
is further supported by PSI’s representations that the flex connector was the
cause of the leak, yet failed to produce the part that was allegedly
defective.  Barron’s repeated insistence to Head and the TNRCC that the
defective flex connector caused the leak induced Head to believe that the
defective product was the cause of the leak and, thus, sue Titeflex, the
company that Barron represented as the manufacturer of the part.  Further, Head’s
reliance on PSI’s representations about the underground storage tank and ATG
systems induced Head to discontinue stick readings, which resulted in fines
assessed by the TNRCC and reduced Head’s ability to detect a leak in the
system.  Moreover, Morris’s instructions to Obregon regarding the inventory
records resulted in calculation errors, which, in turn, resulted in more fines
assessed against Head.  In order to reduce the fines assessed, Head disputed
the enforcement action and incurred $42,925 in attorney’s fees and $2,800 in
expenses.  Furthermore, as a result of PSI’s representations about its systems
and the subsequent leak and clean-up, Head incurred significant costs,
including those associated with the fifty repair requests from 1997 to 2001,
the lost diesel fuel, and the cost of clean-up and remediation, which the jury
properly awarded.  

Based on the foregoing, we
conclude that the record contains more than a scintilla of evidence to support
the jury’s finding on Head’s fraud claim.  See City of Keller, 168
S.W.3d at 810; see also Ernst & Young, L.L.P., 51 S.W.3d at
577; Bradford, 48 S.W.3d at 754-55; Johnson & Higgins of Tex.,
Inc., 962 S.W.2d at 526; Spoljaric, 708 S.W.2d at 434-35.  We
further conclude that, after reviewing the evidence in a neutral light, the
jury’s findings as to Head’s fraud claim is not against the great weight and
preponderance of the evidence as to be manifestly unjust.  See Golden Eagle
Archery, Inc., 116 S.W.3d at 761-62.  Accordingly, we overrule PSI’s fourth
issue. 

D.   Breach of
Contract

By
its fifth issue, PSI challenges the sufficiency of the evidence supporting
Head’s contract claim.  PSI contends that:  (1) there is no evidence that PSI
agreed to build, install, or service the underground storage tank system in accordance
with undefined environmental rules and regulations and industry standards; (2)
the alleged agreement is unenforceable as a matter of law; (3) if an
enforceable contract existed, the evidence is insufficient to show that any
failure to comply resulted in the damages awarded by the jury; and (4) the
damages awarded were not foreseeable.  Head asserts that the evidence
supporting his contract claims is sufficient to establish the essential
elements of his breach of contract claim.

1.    Applicable
Law

Whether a contract exists
is a question of fact for the jury.  See Ward v. Ladner, 322 S.W.3d 692,
698 (Tex. App.–Tyler 2010, pet. filed) (citing Am. Transfer & Storage
Co. v. Reichley, 543 S.W.2d 162, 164 (Tex. App.–Amarillo 1976, writ
ref’d)); Wal-Mart Stores, Inc. v. Lopez, 93 S.W.3d 548, 555-56 (Tex.
App.–Houston [14th Dist.] 2002, no pet.) (describing implied contracts as those
inferred from the acts and conduct of the parties when the facts and
circumstances show a mutual intent to contract); Adams v. H&H Meat
Prods., Inc., 41 S.W.3d 762, 771 (Tex. App.–Corpus Christi 2001, no pet.)
(holding that a jury can properly imply the formation of a contract from any
conduct by both parties recognizing the existence of a contract).  To recover
for breach of contract, a plaintiff must prove:  (1) the existence of a valid
contract; (2) performance or tendered performance by the plaintiff; (3) breach
by the defendant; and (4) harm to the plaintiff as a result of the breach.  See
Adams v. H&H Meat Prods., Inc., 41 S.W.3d 762, 771 (Tex. App.–Corpus
Christi 2001, no pet.); see also Beckham Resources, Inc. v. Mantle
Resources, L.L.C., No. 13-09-00083-CV, 2010 Tex. App. LEXIS 1323, at *22
(Tex. App.–Corpus Christi Feb. 25, 2010, pet. denied).

A contract must be
sufficiently definite in its terms so that a fact-finder can understand what
the promisor undertook.  See Meru v. Huerta, 136 S.W.3d 383, 390 (Tex.
App.–Corpus Christi 2004, no pet.).  If the agreement upon which the plaintiff
relies is so indefinite as to make it impossible for the fact-finder to
determine the legal obligations and liabilities of the parties, it is not an
enforceable contract. Id.  Furthermore, to be legally binding, the
parties must have a meeting of the minds and must communicate consent to the
terms of the agreement.  Id.  The determination of a meeting of the
minds is based upon an objective standard of what the parties said or did
rather than on their subjective state of mind.  Searcy v. DDA, Inc., 201
S.W.3d 319, 322 (Tex. App.–Dallas 2006, no pet.) (citing Wal-Mart Stores,
Inc. v. Lopez, 93 S.W.3d 548, 556 (Tex. App.–Houston [14th Dist.] 2002, no
pet.)).

2.    Discussion

Here,
the jury was asked whether PSI agreed “that [PSI] would build, install or
service the underground storage tank system in accordance with environmental
rules and regulations of the State of Texas and Industry Standards” and if so,
whether PSI failed to comply with this agreement.  The jury answered in the
affirmative to both questions.

At
trial, Barron testified that only a licensed, State-approved entity, such as
PSI, may install an underground storage tank system.  State rules and
regulations prevent Head from installing his own underground storage tank
system.  Barron further testified that PSI is in the business of selling and
servicing all products relating to fueling systems, including the installation,
maintenance, and repair of such systems.  Because Head was not a licensed, State-approved
installer of underground storage tank systems, and because PSI excelled in such
areas, in 1996, Head contracted with PSI to remove the pre-existing steel tanks
and replace them with the double-walled fiberglass underground storage tank
system. 

Barron
noted that PSI is a leader in this industry; that it follows State rules and
regulations associated with the installation and maintenance of the systems;
and that PSI assists clients in complying with applicable rules and
regulations.  In fact, PSI was required to install the underground storage tank
and ATG systems in compliance with State rules and regulations.  Once PSI
installed the underground storage tank system, PSI recommended that Head
install the ATG system.  Based on PSI’s recommendations, Head contracted with
PSI to have the ATG system installed.  Several witnesses testified that PSI
promised to service and repair both systems.  From 1997 to 2001, PSI serviced
and repaired the systems on more than fifty occasions.  With regard to the
underground storage tank system, Head paid PSI $192,647.37 for the
installation, service, and repair of this system.  And after the leak was
discovered, Head hired PSI to investigate and clean up, and PSI agreed to
repair the leak and get operations back online.    

From
the start, Head experienced numerous problems with the underground storage tank
and ATG systems.  Barron acknowledged at trial that it was PSI’s
responsibility to test the system’s leak detectors each year to ensure that
they were operating properly.  Barron later mentioned that he was unsure
whether such testing had actually occurred every year.  Instead, Barron argued
that it was Head’s responsibility to have the leak detectors tested; that Head
could have used another vendor to do the testing; and that PSI only went out to
the truck stop when requested to do so.  Barron’s testimony is undermined by
Carpenter’s assertion that PSI was Head’s exclusive vendor regarding the
underground storage tank system.  In any event, several witnesses testified
that PSI’s failure to properly install the systems caused the leak in question,
and thus, Head incurred significant damages.  Pruneda, in particular,
acknowledged that the leak was caused by a negligently-installed union under
the fourth dispenser. 

Owens,
PSI’s own expert, testified that had the ATG system been installed properly or
worked properly, the more than 20,000 gallon-leak would have been detected
earlier.  Owens stated that the system failed to go into “slow flow mode” once
the leak occurred.  Al Soto, a thirty-year employee of PSI and certified
installer of underground storage tank systems, noted that if installed
correctly, the primary and secondary walls of the underground storage tank
system should not both fail and that fact that they did was “unacceptable.”  If
one of the walls failed, the secondary wall should have absorbed any leakage. 
However, the entire underground storage tank system and the ATG system failed. 
Dr. Pinkston opined that the likelihood of all of these systems failing at once
was 1 in 500 years, or in other words, it should have been “an extremely remote
possibility.”  These failures caused Head to incur the damages awarded,
including the cleanup of the leak, past and future remediation, the cost of the
lost diesel fuel, substantial TNRCC fines, and attorney’s fees associated with
this case and the enforcement action with the TNRCC.   

Despite
the foregoing, PSI asserts that there existed no written agreement between Head
and PSI to build, install, or service either system “in accordance with
environmental rules and regulations of the State of Texas and Industry Standards.” 
PSI further asserts that the agreements between the parties are unenforceable
because they lack definiteness.  We disagree.

The
evidence demonstrates that the parties agreed for PSI to install the
underground storage tank and ATG systems in exchange for payment.  In addition,
witnesses testified that PSI regularly repaired and serviced the systems and
conducted annual testing on the systems, as required by the TNRCC.  Implicit in
these agreements was that PSI would install, maintain, and service these
systems “in accordance with environmental rules and regulations of the State of
Texas and Industry Standards.”  We do not find PSI’s argument persuasive,
especially considering Barron’s testimony that PSI was required to comply with
State rules and regulations in installing, repairing, and servicing the
systems.  Moreover, Barron testified that PSI prides itself on complying with
governing rules and regulations when installing, repairing, and servicing its
clients’ systems and that PSI offers its clients advice about compliance
issues.  In fact, PSI sent Morris to consult Obregon and Carpenter regarding
inventory control records for compliance purposes.  This evidence amounts to
more than a scintilla that PSI agreed to install, service, and repair the systems
at the truck stop “in accordance with environmental rules and regulations of
the State of Texas and Industry Standards.”  See City of Keller, 168
S.W.3d at 810.  We, therefore, reject PSI’s assertion that the agreements
between PSI and Head were unenforceable for lack of definiteness.

Next,
PSI argues that there is not sufficient evidence to demonstrate that PSI
breached the agreements with Head and subsequently caused Head damages.  PSI
also contends that the damages awarded constituted consequential damages, which
were not recoverable because the damages were not foreseeable to the parties at
the time of contracting.  In a breach of contract suit, damages are limited to
the actual damages that are the natural, probable, and foreseeable consequence
of the defendant’s breach.  Hallmark v. Hand, 885 S.W.2d 471, 481 (Tex.
App.–El Paso 1994, writ denied) (citing Mead v. Johnson Group, Inc., 615
S.W.2d 685, 687 (Tex. 1981)); Strain v. Gansle, 768 S.W.2d 345, 346-47
(Tex. App.–Corpus Christi 1989, writ denied) (“It is well established that
compensatory damages may be recovered in an action for breach of contract when
‘the loss is the natural, probable and foreseeable consequence of the
defendant’s conduct.’”).  We disagree with PSI’s contention that the negligent
installation of the underground storage tank system or the implementation of a
defective product in the system and the failure of the ATG system would not
potentially result in a leak and that foreseeable damages would include the
costs of the lost fuel, cost of the clean-up of the leak, past and future
remediation, and other damages that the jury awarded.  As we have already
concluded, implicit in PSI’s agreement to install, repair, and service the
underground storage tank and ATG systems was a duty to act in accordance with State
rules and regulations and industry standards.  The record reflects that the failed
systems did not comply with such rules, regulations, and standards and resulted
in a leak that cost Head significantly to clean up and remediate.  We believe
that such damages could have been foreseen at the time the parties contracted
and the damages naturally flowed from PSI’s breaching of the agreements it had
with Head.  See Mead, 615 S.W.2d at 687; see also Hallmark,
885 S.W.2d at 481; Strain, 768 S.W.2d at 346-47.  In fact, had PSI
complied with such rules, regulations, and industry standards the leak in this
case likely would not have happened, and Head would not have sustained any
damages.  We, therefore, reject PSI’s argument that the evidence supporting the
breach, causation, and damages elements of Head’s breach of contract action is
insufficient.  

Our
review of the record reveals that more than a scintilla of evidence exists to
support the jury’s finding on Head’s breach of contract claim.  See City of
Keller, 168 S.W.3d at 810.  We further hold that, after reviewing the
evidence in a neutral light, the jury’s findings as to Head’s breach of
contract claim is not against the great weight and preponderance of the
evidence as to be manifestly unjust.  See Golden Eagle Archery, Inc.,
116 S.W.3d at 761-62.  Accordingly, we overrule PSI’s fifth issue.   

E.   Negligence

By its sixth issue, PSI
challenges the sufficiency of the evidence supporting the jury’s negligence
finding.  PSI argues that the record contains no evidence of the
standard of care for a certified installer, builder, or service representative
of an underground storage tank system.  Additionally, PSI contends that there is
no evidence indicating that PSI employees breached the applicable standard of
care or proximately caused the damages associated with the leak. 

We note that the record is
clear that Head did not elect to recover on his negligence cause of action. 
The final judgment specifically notes that Head’s damage award is premised on
his breach of contract, breach of implied warranty, fraud, and breach of
fiduciary causes of action.  Because we have concluded that the judgment can be
sustained on Head’s breach of fiduciary duty, breach of contract, or fraud
claims, we need not address PSI’s challenges to the jury’s negligence
findings.  See Tex. R. App. P.
47.1; see also Dana Corp. v. Microtherm, Inc., No.
13-05-00281-CV, 2010 Tex. App. LEXIS 408, at *46 (Tex. App.–Corpus Christi Jan.
21, 2010, pet. granted, judgm’t vacated w.r.m.) (mem. op.); S. Ins. Co. v.
Poal, Inc., No. 13-05-00532-CV, 2008 Tex. App. LEXIS 3911, at *15 (Tex.
App.–Corpus Christi May 22, 2008, no pet.) (mem. op.) (“We also decline to
address Southern’s fourth issue because the award of attorney’s fees in the
interpleader action is dependent on the resolution of other claims that remain
and is not dispositive of this appeal.”).  We overrule PSI’s sixth issue.

F.    Breach of
Warranty

In
its seventh issue, PSI maintains that the evidence does not indicate it
expressly or impliedly warranted to perform services in a good and workmanlike
fashion.  In the alternative, PSI argues that if such a warranty existed, the
record contains no evidence that PSI failed to comply and, thus, proximately
caused Head’s damages.  Head counters that there exists a compelling need for
an implied warranty “to protect Texans from harm caused by stored hydrocarbon
leaks.”  Head does not refute PSI’s argument regarding the existence of an
express warranty between the parties.

            Because we have concluded that the
judgment can be sustained on Head’s breach of fiduciary duty, breach of
contract, or fraud claims, we need not address PSI’s challenges to the jury’s
warranty liability findings.  See Tex.
R. App. P. 47.1; see also Dana Corp., 2010 Tex. App. LEXIS
408, at *46; Poal, Inc., 2008 Tex. App. LEXIS 3911, at *15.  We overrule
PSI’s seventh issue.

V.          
Head’s
Attorneys Fees and Pre-Judgment Interest

By its eighth and ninth
issues, PSI contends that it is entitled to judgment as a matter of law on
Head’s claims for attorney’s fees and pre-judgment interest.  With respect to
Head’s attorney’s fees claim, PSI argues that:  (1) no contract or statute
permits Head to recover attorney’s fees; (2) Head failed to meet the
requirement of presentment under section 38.02 of the civil practice and
remedies code, see Tex. Civ.
Prac. & Rem. Code Ann. § 38.02 (West 2008); and (3) Head failed to
segregate recoverable from unrecoverable attorney’s fees.  Regarding its
pre-judgment interest contention, PSI asserts that Head cannot recover
pre-judgment interest on future damages, nor can he recover pre-judgment
interest without evidence and a finding that he provided written notice of his
claim on November 10, 2001.

A.   Attorney’s Fees

Section 38.001(8) of the
civil practice and remedies code authorizes the recovery of reasonable
attorney’s fees based on contract claims.  Id. § 38.001(8) (West 2008). 
A party who prevails on a breach of contract claim and is awarded damages may
recover its reasonable attorney’s fees under section 38.001(8) of the civil
practice and remedies code.  Green Int’l, Inc. v. Solis, 951 S.W.2d 384,
390 (Tex. 1997); see Intercontinental Group P’ship v. KB Home Lone Star,
L.P., 295 S.W.3d 650, 653 (Tex. 2009) (“Under the American Rule, litigants’
attorney’s fees are recoverable only if authorized by statute or by a contract
between the parties.”); MBM Fin. Corp. v. Woodlands Operating Co., 292
S.W.3d 660, 669 (Tex. 2009); Tony Gullo Motors I, L.P. v. Chapa, 212
S.W.3d 299, 310-11 (Tex. 2006).  An award of attorney’s fees is mandatory under
section 38.001 upon proof of reasonableness.  World Help v. Leisure
Lifestyles, Inc., 977 S.W.2d 662, 683 (Tex. App.–Fort Worth 1998, pet.
denied) (citing Atlantic Richfield Co. v. Long Trusts, 860 S.W.2d 439,
449 (Tex. App.–Texarkana 1993, writ denied); Budd v. Gay, 846 S.W.2d
521, 524 (Tex. App.–Houston [14th Dist.] 1993, no writ)).  Nevertheless, the
amount of the attorney’s fees award lies within the discretion of the trial
court and will only be reversed for an abuse of that discretion.  Ragsdale
v. Progressive Voters League, 801 S.W.2d 880, 881 (Tex. 1990); see Dail
v. Couch, 99 S.W.3d 390, 391 (Tex. App.–Corpus Christi 2003, no pet.).  The
test for abuse of discretion is to determine whether the trial court acted
without reference to any guiding rules or principles, or whether, under the
circumstances of the case, the trial court’s actions were arbitrary or
unreasonable.  Downer, 701 S.W.2d at 241-42.  

In this case, the jury
concluded that PSI breached agreements with Head, and we have affirmed the
jury’s decision.  Because Head prevailed on his breach of contract claim and
was awarded damages, he was entitled to reasonable attorney’s fees.  See
Tex. Civ. Prac. & Rem. Code Ann.
§ 38.001(8); see also Solis, 951 S.W.2d at 390.  On appeal, PSI does not
challenge the reasonableness of the attorney’s fees awarded, but it does argue
that Head failed to timely present his breach of contract claim and that he failed
to segregate attorney’s fees so that the fees were recovered solely under his
breach of contract claim.

1.    Presentment

PSI asserts that Head
failed to timely present his contract claim and that the filing of suit cannot
satisfy the requirements of section 38.002.  See Tex. Civ. Prac. & Rem. Code Ann. § 38.002[25];
Llanes v. Davila, 133 S.W.3d 635, 641 (Tex. App.–Corpus Christi 2003, no
pet.).[26]  Head
counters that based on a correspondence sent on May 30, 2002, PSI knew of his
contract claim more than thirty days before trial.  Head also argues that PSI
waived this contention by failing to object in the trial court to the amount of
attorney’s fees, the reasonableness of the attorney’s fees, and the necessity
of the work performed.

  There is no indication
that PSI objected in the trial court to Head’s apparent failure to present his
contract claim.  Moreover, PSI did not file a verified denial that Head failed
to present his contract claim.  Thus, this contention has not been preserved
for appeal.[27]  See
Tex. R. App. P. 33.1; Llanes,
133 S.W.3d at 641; see also Reveille Trucking, Inc. v. Loera Customs
Brokerage, Inc., No. 13-08-00127-CV, 2010 Tex. App. LEXIS 5027, at **17-20
(Tex. App.–Corpus Christi June 29, 2010, pet. denied) (mem. op.).

2.   
Segregation of Attorney’s Fees

With regard to the
segregation of attorney’s fees, PSI contends that it is entitled to a new trial
because Head did not segregate attorney’s fees with respect to each cause of
action.  Specifically, PSI alleges that Head is entitled to attorney’s fees, if
any, solely on his breach of contract action.  Head asserts that his request
for attorney’s fees could not be segregated because the claims are inextricably
“intertwined.”  Head notes that “the mere fact that Head also prosecuted tort
claims for which attorney[‘]s fees are not recoverable, does not render the
breach of contract attorney[‘]s fees incurred unrecoverable as well.”

In support of its
segregation argument, PSI directs us to the supreme court’s decision in Tony
Gullo Motors.  See 212 S.W.3d at 314.  In Tony Gullo Motors,
the supreme court stated that the general rule for segregation of attorney’s
fees is that “if any attorney’s fees relate solely to a claim for which such
fees are unrecoverable, a claimant must segregate recoverable from unrecoverable
fees.”  Id.  However, the supreme court further explained that:

It is certainly true that Chapa’s fraud, contract, and DTPA
claims were all “dependent upon the same set of facts or circumstances,” but
that does not mean they all required the same research, discovery, proof, or
legal expertise.  Nor are unrecoverable fees rendered recoverable merely
because they are nominal; there is no such exception in any contract, statute,
or “the American Rule.”  To the extent Sterling suggested that a common
set of underlying facts necessarily made all claims arising therefrom
“inseparable” and all legal fees recoverable, it went too far.

 

            But
Sterling was certainly correct that many if not most legal fees in such
cases cannot and need not be precisely allocated to one claim or the other.  Many
of the services involved in preparing a contract or a DTPA claim for trial must
still be incurred if tort claims are appended to it; adding the latter claims
does not render the former services unrecoverable.  Requests for standard
disclosures, proof of background facts, depositions of the primary actors,
discovery motions and hearing, voir dire of the jury, and a host of
other services may be necessary whether a claim is filed alone or with others. 
To the extent such services would have been incurred on a recoverable claim
alone, they are not disallowed simply because they do double service.

 

            .
. . .

 

Intertwined
facts do not make tort fees recoverable; it is only when discrete legal
services advance both a recoverable and unrecoverable claim that they are so
intertwined that they need not be segregated.

 

Id.
at 313-14 (emphasis added).

 

            In this case, PSI did not object to
Head’s alleged failure to segregate attorney’s fees.  If “no objection is made
to the failure to segregate attorney[’s] fees, either at the time evidence of
attorney[’]s fees is presented or at the time of the charge, the error is
waived.”  Holmes v. Concord Homes, Ltd., 115 S.W.3d 310, 313 (Tex.
App.–Texarkana 2003, no pet.); see Tex.
R. Civ. P. 274); Solis, 951 S.W.2d at 389; Hruska v. First
State Bank of Deanville, 747 S.W.2d 783, 785 (Tex. 1988); Arthur J.
Gallagher & Co. v. Dieterich, 270 S.W.3d 695, 705-06 (Tex. App.–Dallas
2008, no pet.); Lesikar v. Rappeport, 33 S.W.3d 282, 317 (Tex. App.–Texarkana
2000, pet. denied)); see also Norrell v. Aransas County Navigation Dist. No.
1, 1 S.W.3d 296, 303-04 (Tex. App.–Corpus Christi 1999, no pet.).  

B.   Pre-Judgment
Interest

With respect to its
argument about pre-judgment interest, PSI asserts that Head was improperly
awarded pre-judgment interest based on future damages and that the pre-judgment
interest calculation does not comport with the time frame outlined in section
304.104 of the finance code.  See Tex.
Fin. Code Ann. § 304.104 (West 2006).  We review a trial court’s award
of pre-judgment interest under an abuse of discretion standard.  See Morales
v. Morales, 98 S.W.3d 343, 348 (Tex. App.–Corpus Christi 2003, pet.
denied); see also Sw. Grain Co. v. Pilgrim’s Pride S.A. de C.V., No.
13-07-00557-CV, 2010 Tex. App. LEXIS 5014, at *16 (Tex. App.–Corpus Christi
June 28, 2010, pet. denied) (mem. op.).  As noted earlier, a trial court abuses
its discretion if it acted arbitrarily, unreasonably, or without reference to
any guiding rules or principles.  See Downer, 701 S.W.2d at 241-42; see
also Sw. Grain Co., 2010 Tex. App. LEXIS 5014, at *16.

Section 301.102 of the
finance code authorizes an award of pre-judgment interest “in a wrongful death,
personal injury, or property damage case.”  Tex.
Fin. Code Ann. § 304.102 (West 2006).  Pre-judgment interest is measured
from the “earlier of the 180th day after the date the defendant receives
written notice of a claim or the date the suit is filed and ending on the day
preceding the date judgment is rendered.”  Id. § 304.104.  However,
“[p]re-judgment interest may not be assessed or recovered on an award of future
damages.”  Id. § 304.1045 (West 2006).

The final judgment
recites that Head was awarded actual damages in the amount of $848,142.38. 
Pre-judgment interest accruing from May 9, 2002 through January 13, 2009, at a
rate of 5% per annum, was awarded to Head for a total amount of $283,178.88 in
pre-judgment interest.  The final judgment does not segregate pre-judgment
interest associated with past and future damages awarded.  PSI does not
challenge the sufficiency of the evidence supporting the amount of damages
awarded, nor does it challenge the failure to segregate pre-judgment interest
between past and future damages.  Nevertheless, Head concedes that to the extent
any pre-judgment interest is attributed to future damages, we should modify the
judgment to reflect only pre-judgment interest on past damages.  See Main
Place Custom Homes, Inc. v. Honaker, 192 S.W.3d 604, 628-29 (Tex. App.–Fort
Worth 2006, pet. denied) (modifying a judgment to exclude $69,283 in
pre-judgment interest that the trial court found to be attributable to future
costs of repair).  However, unlike Honaker, the record in this case does
not contain any findings indicating how much of the pre-judgment interest is
attributable to future damages.  Of the $848,142.38 in actual damages awarded,
$560,450, or approximately 66% of the damages award, constitutes future
damages.  If we were to subtract the future damages from the actual damages award,
we would be left with $287,692.38 in past damages.  It is this amount upon
which pre-judgment interest should be based.  See Tex. Fin. Code Ann. § 304.1045; see
also Honaker, 192 S.W.3d at 628-29.  

In addition, we agree with
PSI’s argument that the time frame outlined in section 304.104 of the finance
code was not properly applied in this case.  We are not sure from where the May
9, 2002 date that serves as the starting point for pre-judgment interest
calculations came.  Based on our review of the record, it appears that Head
first notified PSI of his potential claims on May 30, 2002.  Moreover, Head did
not file suit until February 13, 2008.  In addition, the final judgment
specifies that pre-judgment interest accrued from May 9, 2002 to the date the
judgment was signed, January 13, 2009, a date that section 304.104 of the
finance code excludes in the calculations of pre-judgment interest.  See
Tex. Fin. Code Ann. § 304.104. 
Because there is a discrepancy between the dates the pre-judgment interest
calculations should begin and end and because the trial court did not clearly
specify the amount of pre-judgment interest attributable to future damages, we
believe that a remand is necessary for proper findings and recalculation of
pre-judgment interest, if it is found to be necessary.  See Royal Maccabees
Life Ins. Co. v. James, 146 S.W.3d 340, 354 (Tex. App.–Dallas 2004, pet.
denied) (remanding an award of pre-judgment interest to the trial court for
recalculation); see also Guerrero v. Salinas, No. 13-05-323-CV, 2006
Tex. App. LEXIS 8562, at **48-49 (Tex. App.–Corpus Christi Aug. 10, 2006, no
pet.) (mem. op.) (same).  Accordingly, we sustain PSI’s ninth issue. 

VI.         
Proportionate
Responsibility

In its tenth issue, PSI
alleges that the trial court improperly disregarded the jury’s proportionate
responsibility findings—that PSI was 75% responsible for the leak and Head was
25% responsible.  Head responds that the jury’s proportionate responsibility
finding is immaterial because chapter 33 proportionate responsibility applies
to only tort causes of action and Head elected to recover on, among other
things, his breach of contract cause of action.

“A [jury] question is
immaterial when it should not have been submitted, it calls for a finding
beyond the province of the jury, such as a question of law, or when it was
properly submitted but has been rendered immaterial by other findings.”  Se.
Pipe Line Co. v. Tichacek, 997 S.W.2d 166, 172 (Tex. 1999) (citing Spencer
v. Eagle Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994)).  After the
jury returned its verdict, Head elected to recover on his breach of contract,
breach of implied warranty, fraud, and breach of fiduciary duty causes of
action.  See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co., 747 S.W.2d
785, 787 (Tex. 1988) (“When a party tries a case on alternative theories of
recovery and a jury returns favorable findings on two or more theories, the
party has a right to a judgment on the theory entitling him to the greatest or
most favorable relief.”).  However, neither the jury nor the trial court
specified how the damages assessed corresponded to the causes of action upon
which Head elected to recover.  Citing Garza, PSI argues that the
“jury’s allocation of responsibility to Head is supported by considerable
evidence that Head failed to properly inspect and monitor his diesel storage system.” 
257 S.W.3d at 704-05.  We concluded earlier that the evidence supporting Head’s
breach of contract claim is sufficient.  Therefore, because the damages award
could be premised on Head’s breach of contract claim, a claim in which the
doctrine of proportionate responsibility does not apply, we conclude that the
trial court properly disregarded the jury’s proportionate responsibility
findings as immaterial.  See Tichacek, 997 S.W.2d at 172; Spencer,
876 S.W.2d at 157; see also Doncaster, 161 S.W.3d at 604. 
Accordingly, we overrule PSI’s tenth issue.

VII.        
Overlapping
Damages

By its eleventh issue, PSI
contends that it is entitled to a new trial because the trial court erroneously
refused to instruct the jury on overlapping damages.  PSI asserts that the
trial court should have instructed the jury that “you shall not award any sum
of money on any element if you have otherwise, under some other element,
awarded a sum of money for the same loss.”  According to PSI, the failure to
give this instruction “probably caused the rendition of an improper judgment by
allowing the jury to award a double recovery or probably prevented PSI from
properly presenting its case to this Court by preventing PSI from demonstrating
the existence of a double recovery.”  Head argues that PSI’s sole authority for
this argument, the supreme court’s decision in Golden Eagle Archery, Inc v.
Jackson, 116 S.W.3d 757 (Tex. 2003), is inapplicable.  Head also argues
that PSI’s argument that there was a potential for overlapping damages is not
enough to warrant a new trial.  Moreover, Head counters that PSI failed to
establish a double recovery or that it was harmed by the trial court’s
submission.

In Golden Eagle
Archery, a personal-injury case, the supreme court was tasked to resolve
how courts of appeals should conduct a factual sufficiency review when “(1) a
jury is permitted to award damages for elements that somewhat overlap, (2) the
jury is instructed not to duplicate an award for any particular loss, and (3)
the jury awards no damages or damages that are allegedly inadequate for an
element that could overlap with another.”  Id. at 758.  The evidence
presented at trial in Golden Eagle Archery pertained to more than one
category of damages—physical pain and mental anguish, “physical impairment of
loss of vision,” and “physical impairment other than the loss of vision.”  Id.
at 760.  The jury was instructed to “[c]onsider the elements of damages listed
below and none other.  Consider each element separately.  Do not include
damages for one element in any other element.”  Id. at 762.  The jury
declined to find that the product involved in the incident was defectively
designed; however, it did find that the manufacturer failed to give adequate
warnings about the product’s danger.  Id.  The jury ultimately awarded
damages on several grounds, and Jackson complained that the damages overlapped,
especially with respect to the physical impairment causes of action.  Id.
at 760-61.  In analyzing Jackson’s complaints about the jury charge, the
supreme court noted that defining damage categories for juries in such a way
that they do not overlap may not be feasible for some damage elements.  Id. 
The court further noted that:

The charge in this case permitted the jury to award
separate amounts of damages in six different categories.  The standard of
review to determine factual sufficiency of the evidence that we set forth today
differs from the standard of review that is applied when the jury is asked to
award a single amount of damages, but is told that it may consider various
elements in arriving at that amount.  In the latter circumstance, we have held
that a challenge must address all the elements that could have been considered
by the jury in making its total, single-amount award.  “If there is just one
element that is supported by the evidence, the damages award will be affirmed
if it is supported by the evidence.”

 

In the case before us, the jury had six blanks to fill and
was instructed not to award damages for the same element more than once. 
Unless the record demonstrates otherwise, an appellate court must presume that
the jury followed these instructions.  In conducting its factual sufficiency
review, the court of appeal should presume that the jury did not award damages
to Jackson for any element more than once, unless the record demonstrates
otherwise.

 

Id. at 770-71 (internal citations &
footnotes omitted).  Ultimately, the court concluded that the submission of
both “physical impairment of loss of vision” and “physical impairment other
than loss of vision” as separate damage items was not erroneous.  Id. at
776.  Moreover, the court stated that Golden Eagle Archery had failed to
demonstrate how it was harmed by such a submission.  Id.     

As was the case in Golden
Eagle Archery, the trial court in this case followed the State Bar of Texas
Pattern Jury Charge to some extent.  See id. at 770 (citing Tex. Pattern
Jury Charges PJC 8.2 (2000 ed.)).  Moreover, the instructions contained in the
charge in this case are substantially similar to those contained in the charge
submitted in Golden Eagle Archery.  See id. at 762.  In fact, the
jury in this case was repeatedly instructed to “[c]onsider the following
elements of damages, if any, and none other.”  With respect to the damages
questions upon which PSI complains, the jury was specifically instructed as
follows:

Do not reduce the amount, if any, in your answer because of
the negligence, if any, of Bill Head d/b/a Bill Head Enterprises.  Do not
include interest in any amount of damages you find.

 

Do not include in your answer any amount that you find Bill
Head d/b/a Bill Head Enterprises could have avoided by the exercise of
reasonable care.  Consider the following elements of damages, if any, and none
other.

 

The
jury then answered the damage question by awarding the following amounts:

 

Cost
of the installation of the Underground Storage Tank system in 1996-97.                                                                                                       $          0                                                                                  

Cost of the tank hole liner in 1997.                                              $          0           
           

 

Attorney’s fees for the defense of the Enforcement Action.    $  
47,749.88 

 

Cost
of emergency clean-up of the release discovered in 

November
2001.                                                                              $  
94,127.50

 

Cost of past remediation of the Silver Spur site.                                    $
108,315.00

 

Cost of future remediation of the Silver Spur site.                     $
560,450.00

 

Value
of lost diesel as a result of the release discovered 

in
November 2001.                                                                          $  
30,000.00

 

Cost
of automatic tank gauge/leak detection system 

installed
in 1999.                                                                             $    
7,500.00

 

Amount of the TNRCC fine.                                                          $          0           


 

Clearly, the jury in this
case was instructed to consider each damage element separately, as the jury in
the Golden Eagle Archery case was instructed to do.  See id. at
770-71.  Moreover, we are to presume the jury in this case followed the
instructions provided and did not award Head damages for any element more than
once, unless the record indicates otherwise; it does not here.  See id.
at 771; see also Columbia Rio Grande Healthcare, L.P. v. Hawley, 284
S.W.3d 851, 862 (Tex. 2009) (“The jury is presumed to have followed the court’s
instructions.”); Sanchez v. Excelo Bldg. Maint., 780 S.W.2d 851, 854
(Tex. App.–San Antonio 1989, no writ) (same).  PSI has not shown how it was
harmed by the trial court’s submission, other than speculating hypothetically. 


Based on our review of the
record, we do not find any evidence to suggest that the jury awarded Head
overlapping damages or, in other words, provided Head with a double recovery. 
As such, we cannot say that PSI has demonstrated an entitlement to a new trial
based upon overlapping damages.  Accordingly, we overrule PSI’s eleventh issue.

VIII.      
PSI’s
Contract Claims Against Head

In its thirteenth issue,
PSI argues that it is entitled to the rendition of judgment on its contract
claims against Head because there is no evidence to support the estoppel
defense raised by Head.  Specifically, PSI challenges that the jury’s finding
that Head’s failure to pay PSI for its services was excused.  

The jury found that Head
failed to comply with his agreement to pay PSI for materials and services
provided and concluded that $57,527.49 would be fair compensation for PSI as a
result of the breach.  However, the jury also concluded that Head’s failure to
comply was excused.  The charge stated that Head’s failure to comply was
excused if:

1.   
Petroleum Solutions, Inc.

 

a.   
by words or conduct made a false representation or concealed material
facts,

 

b.   
with knowledge of the facts or with knowledge or information that would
lead a reasonable person to discover the facts, and

 

c.    [w]ith
the intention that Bill Head d/b/a Bill Head Enterprises would rely on the
false representation or concealment in action or deciding not to act; and

 

2.   
Bill Head d/b/a Bill Head Enterprises

 

a.   
did not know and had no means of knowing the real facts and

 

b.   
relied to his detriment on the false representation or concealment of
material facts.

 

In
arguing that he was excused from paying PSI for the invoices presented for
repairs to the systems from 1997 to 2001, Head relied on the doctrine of
estoppel.  As PSI notes, the “burden of proving estoppel and the essential
elements thereof is on the party asserting it and the failure to prove any one
or more of the elements is fatal.”  Barfield v. Howard M. Smith Co. of
Amarillo, 426 S.W.2d 834, 838 (Tex. 1968).  The supreme court further noted
that “the party asserting an estoppel must establish that he relied on the
misleading conduct to his detriment.”  Petroleum Anchor Equip., Inc. v. Tyra,
419 S.W.2d 829, 833 (Tex. 1967).  However, we concluded earlier that the record
contains more than a scintilla of evidence to support the jury’s fraud finding
that Head relied on the numerous false representations made by PSI, including
the functionality of the systems, inventory recordkeeping, and the cause of the
leak, and suffered a detriment in the amount of approximately $1 million in
fines, costs, attorney’s fees, and expenses.  See City of Keller, 168
S.W.3d at 810; see also Barfield, 426 S.W.2d at 838; Tyra, 419
S.W.2d at 833.  Because PSI’s numerous representations caused Head damages, we
conclude that the evidence is sufficient to support the jury’s finding that Head
was excused from performing under the agreements.  See Barfield, 426
S.W.2d at 838; see also Tyra, 419 S.W.2d at 833.  Accordingly, we
overrule PSI’s thirteenth issue. 

IX.         
Titeflex’s
Causes of Action

In its twelfth issue, PSI
argues that Titeflex was not entitled to indemnification as a matter of law
because:  (1) PSI is not a manufacturer under section 82.002(a) of the civil
practice and remedies code, see Tex.
Civ. Prac. & Rem. Code Ann. § 82.002(a); (2) Titeflex was not sued
as an innocent seller of PSI’s product; (3) Head’s claims fail; (4) Titeflex’s
indemnity claims do not constitute a “product liability action” and Titeflex
did not segregate its attorney’s fees; and (5) if the underground storage tank
system is considered a “product,” then PSI is entitled to a new trial. 
Titeflex counters that:  (1) the fact that the underground storage tank system
can be considered an “improvement” to real property does not preclude a
products liability action, nor the applicability of chapter 82 of the civil
practices and remedies code; (2) PSI is a manufacturer and its duty to
indemnify Titeflex was triggered by the allegations contained in Head’s
pleadings, not the outcome of the case; (3) the jury properly concluded that
Titflex was an innocent seller; (4) the trial court properly concluded that
Titeflex was entitled to indemnity from PSI for attorney’s fees, expenses, and
reasonable costs assessed by the jury; and (5) PSI is not entitled to a new
trial based on any contention that it was not permitted to allocate blame to
Titeflex.

A.   Applicable Law

Section 82.002 of the
civil practice and remedies code provides the following, in relevant part:

(a)                 
A manufacturer shall indemnify and hold harmless a seller against loss
arising out of a products liability action, except for any loss caused by the
seller’s negligence, intentional misconduct, or other act or omission, such as
negligently modifying or altering the product, for which the seller is
independently liable.

 

.
. . .

 

(g)                 
A seller is entitled to recover from the manufacturer court costs and
other reasonable expenses, reasonable attorney’s fees, and any reasonable
damages incurred by the seller to enforce the seller’s right to indemnification
under this section.

 

Id. § 82.002(a), (g).  Section 82.001
defines a “[p]roducts liability action” as:

any
action against a manufacturer or seller for recovery of damages arising out of
personal injury, death, or property damage allegedly caused by a defective
product whether the action is based in strict tort liability, strict products
liability, negligence, misrepresentation, breach of express or implied
warranty, or any other theory or combination of theories.

 

Id. § 82.001(2) (West 2011).  On the other
hand, a “[s]eller” is defined as “a person who engaged in the business of
distributing or otherwise placing, for any commercial purpose, in the stream of
commerce for use or consumption a product or any component part thereof.”   Id.
§ 82.001(3).  Section 82.001 defines a manufacturer as “a person who is a
designer, formulator, constructor, rebuilder, fabricator, producer, compounder,
processor, or assembler of any product or any component part thereof and who
place the product or any component part thereof in the stream of commerce.”  Id.
§ 82.001(4).  

B.   Discussion

As noted above, the jury
concluded that PSI was a manufacturer and that Titeflex was a seller within the
context of chapter 82 of the civil practice and remedies code.  See id.
§ 82.001(3)-(4).  Though they were not specifically asked to determine whether
PSI had a duty to indemnify Titeflex, the jury, by awarding Titeflex $382,334
in reasonable attorney’s fees and $68,519.62 in expenses, implicitly concluded
that Head’s claims arose out of a products liability action and that PSI was
required to indemnify and hold harmless Titeflex for losses arising from Head’s
claims.  See id. § 82.002(a), (g).  The trial court, in its final
judgment, noted that Titeflex was an innocent seller.  Further, the trial court
awarded Titflex $12,393.25 in court costs.

1.    Mixed
Questions of Law and Fact

As a threshold matter,
PSI argues that the jury’s conclusions regarding manufacturer and seller
statuses under chapter 82 of the civil practice and remedies code are
immaterial because such determinations are questions of law.  To support this
contention, PSI cites to the supreme court’s decision in Fitzgerald v.
Advanced Spine Fixation Systems, Inc., 996 S.W.2d 864, 867 (Tex. 1999).  We
do not find the Fitzgerald case supportive of PSI’s contention.

In Fitzgerald, the
supreme court analyzed an argument made by a manufacturer “that the Legislature
intended to deny indemnification to sellers who are not in the chain of
distribution from the manufacturer to the injured plaintiff.”  Id. at
865.  Specifically, the manufacturer contended “that prior case law and
legislative history demonstrate that the Legislature’s purpose [in enacting
section 82.002(a) of the civil practice and remedies code] was to codify some
aspects of our [the supreme court’s] decisions and overrule others, resulting
in indemnity only for those seller in the chain of marketing or distribution of
the defective product from the manufacturer to the injured plaintiff.”  Id. 
The supreme court analyzed the construction of section 82.002(a) and concluded
that the manufacturer’s argument conflicted with the intent of the
Legislature.  Id. at 867.  The court held that the unambiguous language
of the statute did not require that a seller be proved to have been in the
specific chain of distribution; based on this interpretation of the statute,
the court implicitly concluded that the seller, Fitzgerald, was entitled to
indemnification from the manufacturer.  Id. at 867, 869.

In this case, the parties
do not contend that section 82.002(a) is ambiguous; they do not advance a novel
interpretation of section 82.002(a); and the analysis of this issue does not require
resorting to the rules of statutory construction.  Instead, our analysis of
PSI’s arguments in this issue involves mixed questions of law and fact or, in
other words, an application of law to the facts.  See Mega Child Care, Inc.
v. Tex. Dep’t of Protective & Regulatory Servs., 29 S.W.3d 303, 309
(Tex. App.–Houston [14th Dist. 2000] 2000) (“An issue involves a mixed question
of law and fact when a standard or measure has been fixed by law and the
question is whether the person or conduct measures up to that standard.”), aff’d,
145 S.W.3d 170 (Tex. 2004); see also Tex. State Secs. Bd. v. Miller, No.
03-06-00365-CV, 2009 Tex. App. LEXIS 5108, at *10 (Tex. App.–Austin July 1,
2009, no pet.) (mem. op.).  In determining whether PSI is a manufacturer and
whether Titeflex is an innocent seller, we must necessarily examine the
evidence adduced at trial and cannot make a determination solely by reference
to the law.  See Mega Child Care, Inc., 29 S.W.3d at 309; see also
Miller, 2009 Tex. App. LEXIS 5108, at *10.  Moreover, the trial court, in
its final judgment adopting the jury’s findings, ostensibly concluded as a
matter of law that PSI was a manufacturer and that Titeflex was an innocent
seller under section 82.001 of the civil practice and remedies code.  We,
therefore, reject PSI’s contention that the jury’s answers regarding the
statuses of PSI and Titeflex are immaterial.  In any event, we defer to the fact-finder’s
factual determinations if they are supported by the evidence and review its
legal determinations de novo.  Brainard v. State, 12 S.W.3d 6, 30 (Tex.
1999), overruled on other grounds by Martin v. Amerman, 133 S.W.3d 262
(Tex. 2004). 

2.   
Whether the Underground Storage Tank System Was an Improvement to
Real Property That Was Not Placed in the Stream of Commerce

 

Next, PSI argues that it
is not a manufacturer because the underground storage tank system was an
improvement to real property that was not placed in the stream of commerce. 
Essentially, PSI challenges the characterization of the underground storage
tank system as a product placed into the stream of commerce in accordance with
chapter 82.  PSI relies heavily on the holdings in Sonnier v. Chisholm-Ryder
Co., 909 S.W.2d 475, 479 (Tex. 1995); Barbee v. Rogers, 425 S.W.2d
342, 346 (Tex. 1968); Palmer v. Espey Huston & Associates, Inc., 84
S.W.3d 345, 356 (Tex. App.–Corpus Christi 2002, pet. denied); Cecil v.
T.M.E. Investments, Inc., 893 S.W.2d 38, 51 (Tex. App.–Corpus Christi 1994,
no pet.); and Hanselka v. Lummus Crest, Inc., 800 S.W.2d 665, 666 (Tex.
App.–Corpus Christi 1990, no writ).  PSI asserts that these cases stand for the
proposition that, as a matter of law, an underground storage tank system is not
a product in the stream of commerce.  Titeflex argues that an improvement to
real property can still be considered a product within the context of chapter
82.  

In Sonnier, the
supreme court addressed the applicability of the statute of repose stated in
section 16.009 of the civil practice and remedies code.  909 S.W.2d at 479.  The
Sonnier court distinguished between:  (1) manufacturers of property who
craft a product that a third party later attaches to real property, thereby
converting the product into an improvement; and (2) manufacturers who actually
work to attach the personalty directly to the real property.  Id.  The Sonnier
court specifically mentioned when “an attachment of personalty to realty
becomes an improvement.”  Id.  Citing to Logan v. Mullis, 686
S.W.2d 605, 607 (Tex. 1985), the Sonnier court stated three factors that
are relevant in determining whether personalty has become a permanent attached
to realty:  (1) the mode and sufficiency of annexation, either real or
constructive; (2) the adaptation of the personalty to the use or the purpose of
the realty; and (3) the intention of the owner who causes the personalty to be
attached to the realty.  Id.  “The owner’s intent is critical because
personalty does not constitute an improvement until it is annexed to realty. 
To constitute an improvement there must be a joinder of personalty with
realty.”  Id.  Regardless of whether the underground storage tank system
constitutes a permanent fixture to realty, the Sonnier court did not
explicitly state that an improvement to real property cannot also be a product
under chapter 82 of the civil practice and remedies code; instead, the court
analyzed whether the statue of repose precluded suit.  Id. at 483
(“Absent any evidence that Chisholm did more, we conclude that Chisholm did not
construct an “improvement to real property” as contemplated by section
16.009.”) (emphasis added).    

PSI cites the Barbee
case for the contention that the underground storage tank system installed at
Head’s truck stop was “not a finished product offered to the general public in
regular channels of trade.”  See 425 S.W.2d at 346.  With respect to the
nature of the appellate complaints, the Barbee court noted that: 

Respondents
and the licensed optometrists in their employ exercise skill and judgment in
the examination, prescription[,] and fitting process[,] whereby it is sought to
remedy visual abnormalities by the use of curved lenses or prisms.  The failure
here is not attributable to the product itself, i.e., the contact lenses, but
to the professional and statutorily authorized act of “measuring the powers of
vision” of Petitioner’s eyes and “fitting lenses . . . to correct or remedy . .
. [his] defect or abnormal condition of vision.”  This is not the act of one
selling a “product in a defective condition unreasonably dangerous to the user”
in the terms of the Torts Restatement.  It is the act of one deemed in law to
have the competence to remedy a visual defect by furnishing particularly
prescribed contact lenses. 

 

Id.

In this case, Titeflex
was sued on the theory of strict liability for allegedly providing a defective
flex connector to the system that PSI assembled and installed.  Because the Barbee
case did not address indemnification or involve products “in a defective
condition unreasonably dangerous to the user,” which served as the basis of the
complaints against Titeflex, we do not find the Barbee case to be
persuasive in this matter.

In Palmer, this
Court addressed complaints pertaining to a breakwater in a marina.  See
84 S.W.3d at 349.  Appellants brought suit after “a series of storms with
prevailing northerly winds generated waves which overtopped or went under the
breakwater and caused damage to the docks and boats inside the marina.”  Id. 
We specifically noted that the design of the breakwater was done by a
professional architectural, engineering, and planning firm and that appellants’
complaints centered “on the design of the breakwater, not the construction of
the breakwater or the provisions of the parts thereof.”  Id. at 349,
356.  In determining whether the trial court erred in granting appellees’
motions for directed verdict, we noted that the breakwater was not movable
because it was a permanent improvement to the real estate and ultimately
concluded, for strict liability purposes, that the breakwater was not put into
the stream of commerce.  Id. at 356.  

PSI’s reliance on the Palmer
case is unfounded for several reasons.  First, the Palmer Court did not
address the applicability of the indemnity provisions contained in chapter 82
of the civil practice and remedies code, nor did the Palmer appellants
assert a right to indemnification or that the construction or usage of parts
was problematic; instead, we addressed appellants’ design complaints.  Second, the
Palmer Court emphasized that the breakwater was not movable and, thus,
was not placed in the stream of commerce.  Id.  Here, Barron testified
that PSI is in the business of assembling and installing underground storage
tank systems and that each of the double-walled, fiberglass storage systems is
essentially the same for all of PSI’s customers.  Barron’s testimony undermines
PSI’s contention on appeal that “the underground storage system was ‘designed
in the light of [Head’s] particular needs.’”  See Barbee, 425 S.W.2d at
346.  Moreover, the system at issue in this case is certainly movable and was
attached to realty, especially considering that the prior system, which was
similar to PSI’s system, was removed from the premises and pieces of PSI’s
system were removed for testing or replacement.  

            In Cecil, the trial court
granted a directed verdict in favor of a company that designed an Executive
Health Spa pool.  893 S.W.2d at 50.  The plaintiff complained that the
company’s design of the pool was defective.  Id.  Essentially, the case
pertained to the company’s manufacturing and installation of coping stones as a
border around the pool.  The plaintiff complained that the coping-stone tiles
were too slippery and improperly installed on top of pre-existing tiles,
creating an uneven surface that caused the plaintiff to lose her balance as she
walked along the pool side.  Id. at 42.  This Court affirmed the trial
court’s directed verdict, concluding that the plaintiff had not raised an
evidentiary dispute regarding the company’s knowledge of any danger in the
design of the pool.  Id. at 51.  Our ruling was not based on whether the
coping stones were products or whether the coping stones had been placed in the
stream of commerce.  With respect to a concurrent marketing-defect claim
brought by the plaintiff, the Cecil Court concluded that there was no
“evidence that the coping stones were unreasonably dangerous or that the
absence of accompanying instruction or warnings caused Cecil’s injury.”  Id.
at 50.  Based on our review of the case, we do not believe that the Cecil
case supports PSI’s inference that a swimming pool, much less an underground
storage tank system, is not a product in the stream of commerce.[28]  


            Finally, PSI cites to our decision in
the Hanselka case, which involved complaints pertaining to sludge
disposal system designed for waste-water disposal unit.  800 S.W.3d at 666.  An
employee of a needle coke plant fell and injured her back while climbing on a
ladder welded to a platform erected over a dumpster that contained sludge.  Id. 
This Court concluded that the claims brought by the employee pertained to the
design of the factory, which required the application of the principles of
ordinary negligence.  Id.  We noted that “[t]his is not a product defect
case in which, because products have been put into the stream of commerce,
strict liability applies.”  Id.  Essentially, we concluded that a
factory is not a product placed in the stream of commerce.  See id.  PSI
compares the factory and sludge disposal system in the Hanselka case to
the underground storage tank system in this case and argues that the
underground storage tank system was not placed in the stream of commerce.  

We disagree that the
factory and the underground storage tank system in this case are similar.  As
previously mentioned, Barron testified that PSI assembles and installs
underground storage tank systems and that the each system is usually identical
or substantially similar to others assembled and installed.  PSI markets itself
as an assembler and installer of underground storage tank systems.  Unlike the
underground storage tank system in this case, the platform over the dumpster in
the Hanselka case appears to be unique to the customer and not something
that is regularly sold to numerous customers.  See id.  As such, we
conclude that the Hanselka case is factually distinguishable.

The supreme court has
recently addressed, within the context of chapter 82, whether synthetic stucco
attached to a real property, a house, constituted a product to which
products-liability law applied.  See Fresh Coat, Inc. v. K-2, Inc., 318
S.W.3d 893, 895 (Tex. 2010).  The Fresh Coat court held that:

Under K-2’s definition of product, products that become
part of homes cannot be the subject of indemnity claims by homebuilders and
their contractors if those homebuilders and contractors are sued by
homeowners.  Instead, K-2 claims that products placed into the stream of
commerce are not products once they become integrated into a house, which is real
property, even if they were products for all purposes beforehand.  We agree
with the court of appeals that Chapter 82 contains no such limitation.

 

. . . .

 

From that definition, a product is something distributed or
otherwise placed, for any commercial purpose, into the stream of commerce for
use or consumption.

 

We hold that the EIFS provided by Fresh Coat was a
“product” as that word is used in the text of Chapter 82.[[29]]

 

Id. at 897; see Black’s Law Dictionary 1245 (8th ed.
2004) (defining a “product” as “[s]omething that is distributed commercially
for use or consumption and that is usu[ally] (1) tangible personal property,
(2) the result of fabrication or processing, and (3) an item that has passed
through a chain of commercial distribution before ultimate use or consumption”);
see also Restatement (Third) of
Torts:  Products Liability § 19 (1998) (“A product is tangible personal
property distributed commercially for use or consumption.  Other items, such as
real property and electricity, are products when the context of their
distribution and use is sufficiently analogous to the distribution and use of
tangible personal property . . . .”).  

In addition, the Fresh
Coat Court cited to other Texas cases in which Texas products-liability law
applied to subcomponents of homes or, in other words, products affixed to real
property.  318 S.W.3d at 899 n.8 (citing Temple EasTex, Inc. v. Old Orchard
Creek Partners, Ltd., 848 S.W.2d 724, 731-32 (Tex. App.–Dallas 1992, writ
denied) (treating fiberboard as a product for purposes of products-liability
claims); Bennett v. Span Indus., Inc., 628 S.W.2d 470, 472 (Tex.
App.–Texarkana 1981, writ ref’d n.r.e.) (noting that has there been a defect in
a component installed in a building, that defect might have supported a legitimate
claim under products-liability law); Cupples Coiled Pipe, Inc. v. Esco
Supply Co., 591 S.W.2d 615, 615-16, 618 (Tex. Civ. App.–El Paso 1979, writ
ref’d n.r.e.); Hovenden v. Tenbush, 529 S.W.2d 302, 305-06 (Tex. Civ.
App.–San Antonio 1975, no writ) (treating used bricks in a building as
defective products after walls made with the bricks deteriorated)).  Following
the analysis conducted by the Fresh Coat Court, we reject PSI’s
contention that the attachment of the underground storage tank system to real
property prevented it from being considered product placed into the stream of
commerce within the context of chapter 82.  See Fresh Coat, Inc., 318
S.W.3d at 897, 902 (“Chapter 82’s text does not limit “product” to exclude
items that may later become part of a house wall.”).

3.    Whether
PSI is a Manufacturer Under Section 82.001(4)

As noted above, section
82.002(a) provides that a manufacturer shall indemnify and hold harmless an
innocent seller against loss arising out of a products liability action.   Tex. Civ. Prac. & Rem. Code Ann. §
82.002(a).  Relying on the plain language of section 82.001(4) and the supreme
court’s decision in General Motors Corp. v. Hudiberg Chevrolet, Inc.,
199 S.W.3d 249, 256-57 (Tex. 2006), Titeflex contends that PSI is a manufacturer. 
Section 82.001(4) defines a manufacturer as, among other things, a “designer .
. . constructor, rebuilder, fabricator, producer . . . or assembler” of any
product that is placed in the stream of commerce.  Tex. Civ. Prac. & Rem. Code Ann. § 82.001(4).  In Hudiberg,
the supreme court noted that “all manufacturers are also sellers, but not all
sellers are manufacturers” and that:

Under
the statute . . . the manufacturer of a component product alleged by a claimant
to be defective has a duty to indemnify an innocent seller/manufacturer of a
finished product which incorporates the component from loss arising out of a
products liability action related to the alleged defect, but the manufacturer
of an allegedly defective finished product has a duty to indemnify the innocent
seller/manufacturer of a component product for the same loss.

 

199 S.W.3d at 256-57.  Here, several witnesses
testified that PSI designs, assembles, and installs underground storage tanks
for customers and that such actions are integral to PSI’s business.  Witnesses
also testified that PSI creates design plans with a listing of component parts
to be incorporated into the system.  Titeflex’s expert, Dr. Pinkston, testified
that, based on his extensive experience and his review of the record, the
underground storage tank system in this case is a product and that PSI is a
manufacturer because it designs, assembles, and installs the systems for
customers.  On appeal, PSI argues that Dr. Pinkston’s testimony should be
disregarded because his testimony is conclusory, and he is not qualified to
testify about a purely legal question.  

            First, we note that PSI did not object
at trial to Dr. Pinkston’s qualifications, his methodology, or his ability to
testify about the issues in this case.  To the extent that PSI objects to Dr.
Pinkston’s qualifications on appeal, we conclude that such arguments have been
waived.  See Borg-Warner Corp. v. Flores, 232 S.W.3d 765, 769 n.11 (Tex.
2007) (“We note initially that Borg-Warner did not challenge, either before
trial or at the time the evidence was offered, the reliability of Flores’s
experts and has, therefore, waived any reliability challenge that would require
us to evaluate the experts’ underlying methodology, technique, or foundational
data.”) (citing Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136
S.W.3d 227, 231-33 (Tex. 2004)).  Second, as we concluded earlier, whether PSI
is a manufacturer and whether Titeflex is an innocent seller are mixed
questions of law and fact.  An expert witness may state an opinion on mixed
questions of law and fact.  See In re Christus Spohn Hosp. Kleberg, 222
S.W.3d 434, 440 (Tex. 2007); Birchfield v. Texarkana Mem’l Hosp., 747
S.W.2d 361, 365 (Tex. 1987) (“Fairness and efficiency dictate that an expert
may state an opinion on a mixed question of law and fact as long as the opinion
is confined to the relevant issues and is based on proper legal concepts.”); Louder
v. DeLeon, 754 S.W.2d 148, 149 (Tex. 1988).  Therefore, in reviewing the
evidence in the light most favorable to the jury’s findings, we conclude that a
rational juror, based on the plain language of section 82.001(4) and the
abundance of relevant evidence in the record, could have concluded that PSI is
a manufacturer under section 82.001(4).  See Tex. Civ. Prac. & Rem. Code Ann. § 82.001(4); see also
Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 248
(Tex. 2008); Brainard, 12 S.W.3d at 30.  

4.    Whether
Titeflex is an Innocent Seller Under Section 82.001(3)

            A seller under section 82.001(3) of
the civil practice and remedies code is an entity “engaged in the business of
distributing or otherwise placing, for any commercial purpose, in the stream of
commerce for use or consumption a product or any component part thereof.”  Tex. Civ. Prac. & Rem. Code Ann. §
82.001(3).  “Anyone who qualifies as a ‘seller’ may seek indemnification,
subject to the limitations of section 82.002(a).”  Fitzgerald, 996
S.W.2d at 867.  The limitation of section 82.002(a) is that the seller must be
innocent of any “negligence, intentional misconduct, or other act or omission,
such as negligently modifying or altering the product, for which the seller is
independently liable.”  Tex. Civ. Prac.
& Rem. Code Ann. § 82.002(a); see Owens & Minor, Inc. v.
Ansell Healthcare Prods., Inc., 251 S.W.3d 481, 482 (Tex. 2008).  

The record reflects that
Titeflex makes and sells a type of flex connector that is a component part in a
finished underground storage tank system.  In fact, Barron certified to the
TRNCC and testified at trial that the alleged faulty flex connector in this
case was manufactured and sold by Titeflex, though Barron’s assertions were
hotly disputed.  PSI was unable to produce the faulty flex connector that was
removed from Head’s underground storage tank system; and Barron was unable to
produce handwritten notes that he alleged described the faulty flex connector
as having been manufactured and sold by Titeflex.  Pictures of the faulty flex
connector were admitted at trial, and experts described the flex connector as
having been manufactured and sold by Resistoflex.  Nevertheless, both PSI and
Head sued Titeflex, based on PSI’s assertions that the cause of the leak was
the flex connector manufactured and sold by Titeflex.  Later, Head discovered
that there was no evidence indicating that Titeflex was at fault; thus, Head
non-suited his claims against Titeflex.  It was not until much later did PSI
non-suit its third-party claims against Titeflex, only after PSI failed to
produce the alleged faulty flex connector, Barron’s handwritten notes, and Dr.
Corneilissen’s expert testimony on Titeflex’s purported liability in the case. 
Essentially, other than Barron’s own statements, there is no evidence that
Titeflex was at fault for the leak, a contention that is supported by the fact
that all claims against Titeflex were eventually non-suited.  The jury
ultimately concluded that Titeflex was a seller, and the trial court, in its
final judgment, specifically noted that Titeflex was an innocent seller within
the context of chapter 82.  

Viewing the evidence is
the light most favorable to the jury and the trial court’s findings, we
conclude that a rational fact-finder, based on the plain language of section
82.001(3) and the abundance of relevant evidence in the record, could have
concluded that Titeflex is an innocent seller under section 82.001(3).  See
Tex. Civ. Prac. & Rem. Code Ann.
§ 82.001(3); see also Hogue, 271 S.W.3d at 248; Brainard,
12 S.W.3d at 30.

5.    Product
Liability Actions

Despite having concluded
that PSI is a manufacturer and Titeflex is a seller under chapter 82, we must
now determine whether the underlying causes of action against Titeflex were
products liability actions entitling Titeflex to indemnification.  Section
82.001(2) of the civil practice and remedies code defines a “[p]roducts
liability action” as “any action against a manufacturer or seller for recovery
of damages arising out of . . . property damage allegedly caused by a defective
product whether the action is based in strict tort liability, strict products
liability, negligence, misrepresentation, breach of express or implied
warranty, or any other theory or combination of theories.”  Tex. Civ. Prac. & Rem. Code Ann. §
82.001(2); see JCW Elecs., Inc. v. Garza, 257 S.W.3d 701, 705 (Tex.
2008); see also HCA Health Servs. of Tex., Inc. v. Danek Med., Inc., No.
13-03-00556-CV, 2005 Tex. App. LEXIS 8408, at **5-7 (Tex. App.–Corpus Christi
Oct. 13, 2005, no pet.) (mem. op.).     

In its third-party action
against Titeflex, PSI alleged the following:

The
underground flex connector was defective to such a degree as to render it
unreasonably dangerous, and it reach[ed] Petroleum Solutions, without
substantial change in its condition from the time it was originally sold.  The
defect cause[d] the changes alleged by Plaintiff [Head].  Therefore, Titeflex
is strictly liable under products liability law . . . .  Titeflex is
strictly liable to Petroleum Solutions, and the plaintiff for his injuries,
damages, if any, under products liability law.

 

(Emphasis added.)  Like PSI, Head also alleged a
products-liability action against Titeflex:  “As stated in the third[-]party
action, Petroleum Solutions purchased the underground flex connector from
Titeflex.  Titeflex manufactured the flex connector.  Titeflex is strictly
liable for damages caused by the defective flex connector.”  

In Meritor Automotive,
Inc. v. Ruan Leasing Co., the supreme court held that “the manufacturer’s
duty to indemnify the seller is invoked by the plaintiff’s pleadings and
joinder of the seller as defendant.”  44 S.W.3d 86, 91 (Tex. 2001); see
Hudiberg Chevrolet, Inc., 199 S.W.3d at 256 (“The duty to indemnify is
triggered by the injured claimant’s pleadings.”); see also Owens &
Minor, Inc., 251 S.W.3d at 484.  Thus, we look to Head’s pleadings to
determine whether PSI, the manufacturer, had a duty to indemnify Titeflex, the
innocent seller.  See Equitable Recovery, L.P. v. Health Ins. Brokers of
Tex., L.P., 235 S.W.3d 376, 387 (Tex. App.–Dallas 2007, pet. denied)
(“Contribution and indemnity are methods by which the burden of paying damages
to a plaintiff is shifted from one defendant to another, both of whom are
jointly liable to the plaintiff on the same claim.  It follows that no right of
contribution or indemnity exists unless the plaintiff has a claim
against the co-liable parties.  In other words, contribution and indemnity are
not independent claims but are “derivative” of the plaintiff’s claims against
each co-liable party.  There can be no contribution or indemnity between two
parties based on a direct claim between them.”) (emphasis in original)
(citations omitted). 

Based on our reading of
section 82.001(2) and related case law, we conclude that the claims brought
against Titeflex constituted products-liability actions and because Titeflex
was an innocent seller, it was entitled to indemnification from PSI, the
manufacturer.  See Tex. Civ.
Prac. & Rem. Code Ann. § 82.001(2); Garza, 257 S.W.3d 701,
705 (Tex. 2008); see also Danek Med., Inc., 2005 Tex. App. LEXIS 8408,
at **5-7.

6.   
The Relationship Between Titeflex’s indemnification Claims and
Head’s Claims Against PSI

 

Nevertheless, PSI argues
that Titeflex’s indemnification claims should fail because Head’s claims
against PSI fail.  First, we have already affirmed the jury’s conclusions as to
Head’s claims against PSI.  Second, section 82.002(e)(1) provides that a manufacturer’s
duty to indemnify an innocent seller “applies without regard to the manner in
which the action is concluded.”  Tex.
Civ. Prac. & Rem. Code Ann. § 82.002(e)(1); see Owens &
Minor, Inc., 251 S.W.3d at 483 (“Thus, under Section 82.002, the manufacturer
is now liable to the seller regardless of how the injury action is resolved.”);
see also Hudiberg Chevrolet, Inc., 199 S.W.3d at 255 (“However, the duty
to indemnify does not depend on an adjudication of the indemnitor’s
liability, as it does under the common law.  This follows from section
82.001(e)(1), which states that ‘the duty to indemnify under this
section . . . applies without regard to the manner in which
the action is concluded”—whether by judgment, settlement, or dismissal.”)
(emphasis in original) (footnote omitted).  Thus, we reject PSI’s contention
that Titeflex’s claims should fail because Head’s claims fail, because the
resolution of Head’s claims is irrelevant to the analysis of Titeflex’s
indemnification claims.

7.    The
Segregation of Titeflex’s Attorney’s Fees

PSI also argues that
there is legally insufficient evidence of Titeflex’s segregated attorney’s fees
and expenses.  Specifically, PSI alleges that Titeflex’s recovery of
$450,853.62 (the sum of the reasonable attorney’s fees and expenses awarded by
the jury) “cannot be upheld as a ‘loss arising out of a product liability
action.’”  See Tex. Civ. Prac.
& Rem. Code Ann. § 82.002(a).  PSI also contends that Titeflex “was
required to segregate out the fees associated with its defense of PSI’s claim
for contribution and indemnity, and the fees associated with its defense of
plaintiff’s [Head’s] claims against it as the manufacturer of the Titeflex flex
connector.”  See Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 314
(Tex. 2006).  Titeflex asserts that there is sufficient evidence in the record
to demonstrate that PSI was required to indemnify Titeflex for court costs,
reasonable attorney’s fees, and expenses.  See Tex. Civ. Prac. & Rem. Code Ann. § 82.002(a)-(b), (g); see
also Hudiberg Chevrolet, Inc., 199 S.W.3d at 256. 

At the outset of our
analysis, we note that PSI has not directed us to a portion of the record
demonstrating that an objection was made to Titeflex’s purported failure to
segregate its attorney’s fees and expense requests.  PSI’s counsel questioned
both of Titeflex’s attorneys, Thomas A. Cowen and George E. Petersmarck, about
the segregation of their attorney’s fees and expenses; however, no objection
was made.  See Holmes, 115 S.W.3d at 313 (citing Tex. R. Civ. P. 274; Solis, 951
S.W.2d at 389; Hruska, 747 S.W.2d at 785; Dieterich, 270 S.W.3d
at 705-06; Lesikar, 33 S.W.3d at 317); see also Norrell, 1 S.W.3d
at 303-04.  Because PSI did not object to the segregation of Titeflex’s
attorney’s fees and expenses, we conclude that PSI’s segregation contention was
waived.  See Solis, 951 S.W.2d at 389; Dieterich, 270 S.W.3d at
705-06; Norrell, 1 S.W.3d at 303-04.  We now turn to PSI’s sufficiency
argument pertaining to Titeflex’s attorney’s fees and expense requests.   

Section 82.002(g), which
provides that a seller is entitled to recover from a manufacturer court costs,
other reasonable expenses, and reasonable attorney’s fees, is the procedural
vehicle by which Titeflex sought to procure reasonable attorney’s fees and
expenses.  See Tex. Civ. Prac.
& Rem. Code Ann. § 82.002(g).  “As a general rule, the party seeking
to recover attorney’s fees carries the burden of proof.”  Stewart Title
Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991).  A determination of
reasonable attorney’s fees is a question for the trier of fact.  Id. at
12.  Factors that a fact-finder should consider when determining the reasonableness
of a fee include:  (1) the time and labor required, the novelty and difficulty
of the questions involved, and the skill required to perform the legal service
properly; (2) the likelihood that the acceptance of the particular employment
will preclude other employment by the lawyer; (3) the fee customarily charged
in the locality for similar legal services; (4) the amount involved and the
results obtained; (5) the time limitations imposed by the client or by the
circumstances; (6) the nature and length of the professional relationship with
the client; (7) the experience, reputation, and ability of the lawyer or
lawyers performing the services; and (8) whether the fee is fixed or contingent
on results obtained or uncertainty of collection before the legal services have
been rendered.  See Arthur Andersen & Co. v. Perry Equip Corp., 945
S.W.2d 812, 818 (Tex. 1997).  Evidence of each of the Andersen factors
is not required to support an award of attorney’s fees, and an attorney’s fees
expert “may testify that he reviewed an attorney’s file and offer an opinion
that the fees charged for that work were reasonable and necessary.”  Dieterich,
270 S.W.3d at 706.

Titeflex was represented
by counsel from Michigan, Petersmarck, and by local counsel, Cowen. 
Petersmarck testified that he and his firm worked 1,032 hours on this case; and
that he charged $160 per hour while his associates billed at $140 per hour. 
Cowen, on the other hand, noted that his firm worked 701 hours on this case;
his firm’s attorneys billed at $150 per hour; and his paralegals billed at $75
per hour. Petersmarck stated that the total amount of attorney’s fees incurred
by both firms was $382,334, and the total amount of expenses incurred was
$68,519.62.  Petersmarck testified that both he and Cowen had their attorney’s
fees audited by third parties, including Titeflex’s comptroller, and the third
parties concluded that the requests were appropriate and reasonable.  Detailed
billing statements for the work done by Petersmarck and Cowen’s firms were
admitted into evidence for the jury to review and evaluate.  These statements
reflected the nature of the services rendered, the date of service, the length
of time spent on the case, applicable billing rates, and the fees and costs
incurred for the services rendered.  Both Cowen and Petersmarck testified that
they did not charge Titeflex for all the work that was necessary to prepare to
defend both PSI and Head’s lawsuits and that their hourly rates were reasonable
for the locale—Hidalgo county.  PSI did not present any expert testimony to
refute the attorney’s fees and expenses requested by Titeflex; instead, PSI
relied solely on cross-examination.  And at a pre-trial hearing, Titeflex
presented uncontroverted argument that it incurred $12,393.55 in court costs;
the trial court, in its discretion, ordered PSI to reimburse Titeflex for all
of its court costs. 

Though PSI waived its
segregation contention, on cross-examination, counsel for PSI questioned
Petersmarck about whether the attorney’s fees requested by Titeflex were
segregated between the lawsuit PSI filed against Titeflex and the lawsuit filed
against Titeflex by Head.  See Osborne v. Jauregui, Inc., 252 S.W.3d 70,
76 (Tex. App.–Austin 2008, pet. denied) (noting that the extent to which
attorney’s fees can be segregated is a mixed question of law and fact); see also Birchfield, 747 S.W.2d at 365
(stating that an expert may testify to ultimate issues which are mixed
questions of law and fact).  To this question Petersmarck responded that he and
Cowen were unable to segregate the attorney’s fees because “it’s all
intertwined.”  PSI’s counsel then questioned Petersmarck about Titeflex’s
defense of Head’s lawsuit to which Petersmarck responded that Head never
submitted any discovery and any defense costs incurred in defending the Head
lawsuit pertained to filing an answer to Head’s petition.

            Considering all of the evidence in the
light most favorable to the verdict and indulging every reasonable inference
from that evidence in support of the verdict, we conclude that legally
sufficient evidence exists to uphold the award of attorney’s fees, court costs,
and expenses.  See City of Keller, 168 S.W.3d at 827; see also
Dieterich, 270 S.W.3d at 706.  Furthermore, in reviewing the evidence in a
neutral light, we cannot conclude that the jury’s attorney’s fees, court costs,
and expense awards were so contrary to the overwhelming weight of the evidence
as to be clearly wrong or unjust.  See Cain, 709 S.W.2d at 176; see
also Dieterich, 270 S.W.3d at 706.

8.   
PSI’s Entitlement to a New Trial

 

Finally, PSI argues that
it is entitled to a new trial on Titeflex’s claims because the trial court’s
sanctions order—striking PSI’s proportionate responsibility and responsible
third party defenses—deprived PSI from trying the issue of Titeflex’s
“innocence.”  We disagree.

The record does not
contain any evidence indicating that Titeflex was none other than an innocent
seller.  PSI failed to produce the alleged faulty flex connector; the pictures
admitted into evidence did not demonstrate that Titeflex had manufactured the
alleged faulty flex connector; Barron was unable to produce his handwritten
notes allegedly detailing that the flex connector that was removed from under
fourth dispenser was manufactured by Titeflex; and Titeflex failed to present
expert testimony regarding Titeflex’s fault in this matter.  In fact, PSI’s
expert, Corneilssen, failed to appear for his deposition.  As a result of the
dearth of evidence implicating Titeflex, both Head and PSI non-suited
Titeflex.  Moreover, the trial court’s sanctions order did not prevent PSI from
calling witnesses to refute Titeflex and Head’s claims, including Head’s
negligence, breach of warranty, and breach of contract claims, and to establish
that Titeflex was not an innocent seller within the context of sections
82.001(3) and 82.002(a).  See Tex.
Civ. Prac. & Rem. Code Ann. §§ 82.001(3), 82.002(a).  In addition,
we have already concluded that the trial court did not abuse its discretion in
issuing its sanctions order.   

            Based on lack of evidence implicating
Titeflex, we cannot say that PSI is entitled to a new trial to dispute
Titeflex’s status as an “innocent seller” under section 82.002(a).  See id.
§ 82.002(a); see also Hudiberg Chevrolet, Inc., 199 S.W.3d at 255 (“To
escape this duty to indemnify, the indemnitor must prove the indemnitee’s
independent culpability.”); Ruan Leasing Co., 44 S.W.3d at 91 (“[I]t
must be established that seller’s conduct ‘caused’ the loss.”); The Charles
Machine Works, Inc. v. Butler Rental & Sales, Inc., 327 S.W.3d 779, 787
(Tex. App.–Corpus Christi 2010, pet. filed) (“An inference is insufficient to
establish the exception to a manufacturer’s duty to indemnify; instead, to
invoke the exception, a manufacturer must prove:  (1) that the seller
was independently culpable and (2) that the seller’s conduct “caused the
loss.”) (emphasis in original).  Having rejected all of PSI’s contentions
pertaining to Titeflex, we overrule PSI’s twelfth issue. 

X.          
Conclusion

We reverse and remand for
recalculation of pre-judgment interest, if necessary.  We affirm the trial
court’s judgment in all other respects.         

                                                

                                                                                    __________________

Rogelio Valdez

                                                                                                Chief
Justice

 

 

Dissenting Memorandum
Opinion by Justice Vela.

 

Delivered and filed the


29th day of April,
2011.

 

 









[1]
The land upon which The Tapadera was situated had been previously contaminated
by a fuel leak, but the State had contracted with companies to clean up the
leak.  Head testified that when he purchased the property, the prior
contamination had been remediated.

 





[2]
The December 22, 1998 regulation also allowed operators to utilize a soil-vapor
monitor or a statistical-inventory reconciliation; however, Robert Carpenter,
the manager of the Silver Spur Truck Stop, testified that PSI only recommended
the ATG system.  Carpenter explained that PSI told him that the ATG system “was
supposed to be leaps and bounds over what they expected us to do [using the
stick method].  It was kind of a computerized piece of equipment.”  Carpenter
noted that the ATG system was designed to be more accurate than the stick
method.  Morris later testified that PSI sold and installed ATG systems, yet it
did not do soil-vapor monitoring or statistical-inventory reconciliation.

 





[3]
The record reflects that between 1997 and 2001, PSI invoiced Head at least
fifty times for service calls on the systems that PSI installed at the Silver
Spur Truck Stop.





[4]
PSI alleged at trial that the volatility could be explained as bad
inventory-control accounting on the part of Head.  Sullivan Curran, one of Head’s
expert witnesses, noted that even if PSI was correct in asserting that Head’s
inventory control records were bad, the ATG system failures made it very
difficult for Head to discover the leak.

 





[5]
In a mandatory “Release Determination Report Form” prepared by PSI on December
11, 2001, PSI informed the TNRCC that:  “Diesel noted in observation wells and
in drainage ditch located in proximity to facility.”  PSI also noted that the
soil and an irrigation drainage ditch were impacted.





[6] 
Among those who arrived at the truck stop once the leak was discovered was
Morris.  Morris testified that he went to the truck stop on his own volition
and that he subsequently assisted Obregon in creating inventory records to
submit to the TNRCC.  Obregon testified that Morris instructed him to round off
inventory figures before reporting the information to the TNRCC.  Other
witnesses stated that Morris told Obregon to alter inventory entries for the
months preceding the leak to reflect gross figures rather than net figures. 
Head’s experts opined that these figures were altered to minimize PSI’s fault
with respect to the leak and to show that Head was not diligent in discovering
the leak.





[7]
At trial, Barron acknowledged that he is president of both PSI and ERM. 
Moreover, Barron testified that ERM is a publically-traded company and that PSI
owns 75% of ERM’s stock.  On cross-examination, Barron admitted that PSI
ostensibly controls the business of ERM.

 





[8]
Barron admitted at trial that much of the information contained in Morris’s
chronology was based on information Barron had told Morris about the leak and
the subsequent cleanup.

 





[9]
The record reflects that Boots & Coots performed work at the truck stop from
November 8, 2001 to November 9, 2001, removing diesel fuel that had spilled
into two drainage canals and irrigation canals that were in close proximity to
the truck stop and implementing “boons” to absorb and stop the migration of
hydrocarbons.  Boots & Coots charged Head $16,178.03 for their services. 
Head’s expert, Daniel Airey, testified it was a reasonable charge for the
services provided.

 





[10]
It was established at trial that Morris used to work for the TNRCC and had
trained Cordova to be a TNRCC investigator.

 





[11]
Among the citations issued to Head was for failing to correctly label each
underground storage tank, which several witnesses testified was PSI’s
responsibility.

 





[12]
One of Head’s attorneys, Donald Grissom, testified that he handled the TNRCC’s
enforcement action and that Head incurred $42,925 in attorney’s fees, plus
$2,800 in expenses.  Grissom noted that his hourly fee of $250 was reasonable
for this service in Travis and Hidalgo counties.  Grissom referenced Travis
county because several administrative hearings took place in Austin, Texas,
which is the county seat of Travis county.  See Tex. State Hist. Assoc.,
Austin, TX (Travis County), available at http://www.tshaonline.org/handbook/online/articles/hda03
(last visited Mar. 30, 2011).  In fact, Grissom acknowledged that about 90% of
the work done on the enforcement action took place in Austin.





[13]
Pruneda also noticed that the system had two boots with holes and that there
were kinked hoses in the system, which allowed for the fuel pressure to
increase.  Pruneda testified that the effect of too much pressure would be “the
flex hose can go bad.  You would have a leak.”





[14]
Head acknowledged that PSI had submitted invoices for the amount requested in
its counterclaim; however, Head refused to pay the invoices because he believed
that PSI was at fault for causing the leak.

 





[15]
Ultimately, Titeflex’s motion for summary judgment was denied by the trial
court.





[16]
In support of its contentions in its response to Titeflex and Head’s motions
for sanctions, PSI included the affidavit of Elizabeth Neally, an attorney who
previously worked on this case, who averred that she took possession of the
flex connector from Barron on or about February 2002.  She then sent the flex
connector to David Hendrix, one of PSI’s consulting experts, “to perform a
non-evasive examination of the flex connector[,] the subject of this suit.”  In
September 2002, Neally received an invoice from Hendrix regarding the
examination of the flex connector; however, Hendrix apparently never returned
the flex connector to Neally, nor did he respond to PSI’s requests for the
return of the flex connector. 





[17]
Regarding Head’s negligence claim, the jury apportioned PSI’s fault at 75%,
with the remaining 25% apportioned to Head.

 





[18]
Despite concluding that Head was excused from complying with his agreements
with PSI, the jury determined that PSI was entitled to $57,527.49 in
compensation from Head.

 





[19]
In an affidavit supporting the filing of a supersedeas bond on behalf of PSI,
Barron averred that PSI has $13,200,367.27 in assets and $11,124,894.83 in
liabilities and capital; thus, PSI’s net worth is $2,075,472.44.  Half of PSI’s
net worth equals approximately $1,037,737.





[20]
In Wal-Mart Stores, Inc. v. Johnson, the supreme court stated that:

 

Evidence may be
unavailable for discovery and trial for a variety of reasons.  Evidence may be
lost, altered or destroyed willfully and in bad faith or it may be lost for
reasons completely innocent.  Sometimes, lost evidence may be easily
replicated, or it may be so marginal that it has little or no effect on the
outcome of the case.  On other occasions, the loss or destruction of evidence
may seriously impair a party’s ability to present its case.  A trial judge
should have discretion to fashion an appropriate remedy to restore the parties
to a rough approximation of their positions if all evidence were available. 
These remedies must generally be fashioned on a case-by-case basis.

 

106 S.W.3d 718, 721 (Tex. 2003).

 





[21]
In Trevino v. Ortega, Justice Baker noted that:

 

Because parties have
a duty to reasonably preserve evidence, it is only logical that they should be
held accountable for either negligent or intentional spoliation.  While
allowing a court to hold a party accountable for negligent as well as
intentional spoliation may appear inconsistent with the punitive purpose of
remedying spoliation, it is clearly consistent with the evidentiary rationale
supporting it because the remedies ameliorate the prejudicial effects resulting
from the unavailability of evidence.  In essence, it places the burden of the
prejudicial effects upon the culpable spoliating party rather than the innocent
nonspoliating party.

 

969 S.W.2d 950, 957 (Tex. 1998) (Baker, J.,
concurring) (internal citation omitted).





[22]
Ordinarily, the limitations period for negligence causes of action and causes
of action for breach of an implied warranty arising out of an oral contract is
two years from the accrual date.  See Tex.
Civ. Prac. & Rem. Code Ann. § 16.003(a) (West Supp. 2010); see
also Certain-Teed Prods. Corp. v. Bell, 422 S.W.2d 719, 721 (Tex. 1968). 
Breach of contract, fraud, breach of fiduciary duty, and breach of an implied
warranty arising out of a written contract claims have a four-year limitations
period.  See Tex. Civ. Prac.
& Rem. Code Ann. § 16.004(a)(4)-(5) (West 2002), § 16.051 (West
2008); see also Bell, 422 S.W.2d at 721.





[23]
Implicit in the jury’s finding that PSI was Head’s agent is that Head was the
principal.





[24]
Obregon testified that he was unsure about the whereabouts of the records he
created prior to Morris’s instructions to recreate records.  Obregon noted that
someone took the records, and he never saw them again.  Moreover, PSI’s own
expert, Mark Owens, testified that net figures should be used when reconciling
inventory figures.





[25]
Section 38.002 of the civil practice and remedies code provides that:

 

To recover attorney’s
fees under this chapter:

 

(1)   the claimant must be
represented by an attorney;

 

(2)   the claimant must
present the claim to the opposing party or to a duly authorized agent of the
opposing party; and

 

(3)   payment for the just
amount owed must not have been tendered before the expiration of the 30th day
after the claim is presented.

 

Tex.
Civ. Prac. & Rem. Code Ann. § 38.002 (West 2008).





 

[26] In Llanes
v. Davila, this Court noted that:

 

To
recover attorney’s fees, the claimant must present the claim to the opposing
party.  The purpose of the presentment requirement is to allow the person
against whom a claim is asserted an opportunity to pay within thirty days of
receiving notice of the claim, without incurring an obligation for attorney’s
fees.  The party must plead and prove that he or she presented a contract claim
to the opposing party, and the opposing party failed to tender performance.  No
particular form of presentment of a claim is required.  

 

            . . . .

 

In
the instant case, appellees argue that presentment was made through their
pleadings and participation in mediation.  However, neither the filing of a
suit, nor the allegation of a demand in the pleadings can alone constitute presentment
of a claim or a demand that the claim be paid.

 

133 S.W.3d 635, 641 (Tex. App.–Corpus
Christi 2003, no pet.) (internal citations omitted). 





 

[27] In any event, we note that record contains a letter
dated May 30, 2002, in which Head’s counsel stated, in regards to PSI’s
requests for payment for work performed at the truck stop, that:

 

Your letter dated May 21,
2002[,] grossly over[]simplifies the current situation between our clients.  It
is my understanding that equipment installed by your client [PSI] resulted in a
fuel spill at the Truck Stop and damages ensuing therefrom.  Based upon my
review of the situation and in the event your client elects to pursue this
matter further, you will leave my client with no option other than to allege
causes of action against your client for breach of contract, negligence
along with other violations of Texas law.  However, I am sure that an amicable
resolution to this matter can be reached. 

 

(Emphasis added).  Because section 38.002 is to “be liberally construed
to promote its underlying purpose,” see Jones v. Kelley, 614 S.W.2d 95,
100 (Tex. 1981), because no particular form of presentment of a claim is
required, and because Head’s May 30, 2002 letter informed PSI about a possible
breach of contract action, PSI’s presentment contention would fail even if it
had been preserved.  See Llanes, 133 S.W.3d at 641 (citing Grace v.
Duke, 54 S.W.3d 338, 344 (Tex. App.–Austin 2001, pet. denied); Carr v.
Austin Forty, 744 S.W.2d 267, 271 (Tex. App.–Austin 1987, writ denied)).

 





[28]
The Cecil court did note, however, that any error in the design of the
coping stones would raise strict liability issues, but errors in the design of
the pool must be addressed under theories of negligence.  Cecil v T.M.E.
Invs., Inc., 893 S.W.2d 38, 51 (Tex. App.–Corpus Christi 1994, no pet.)
(citing Wochner v. Johnson, 875 S.W.2d 470, 475-77 (Tex. App.–Waco 1994,
no writ) (distinguishing between negligence and strict liability in a suit
against the seller of materials and plans for the construction of a home); Hanselka
v. Lummus Crest, Inc., 800 S.W.2d 665, 666 (Tex. App.–Corpus Christi 1990,
no writ) (concluding that a cause of action based on the flawed design of a
factory lies in negligence rather than strict liability); Bennett v. Span
Indus., Inc., 628 S.W.2d 470, 472-73 (Tex. App.–Texarkana 1981, writ ref’d
n.r.e.) (holding that absent proof of a design defect involving roofing
products, a roofing manufacturer might be held liable only under negligence
theories)).  However, a negligence claim that is properly joined with a
products liability claim is to be considered part of the products liability
action in terms of a manufacturer’s duty to indemnify an innocent seller, and
the manufacturer is required to indemnify the seller for any loss arising out
of the action, except when there is a finding that the seller independently
caused the loss.  Toyota Indus. Equip. Mfg. v. Carruth-Doggett, Inc.,
325 S.W.3d 683, 690-91 (Tex. App.–Houston [1st Dist.] 2010, pet. filed) (citing
Meritor Automotive, Inc. v. Ruan Leasing Co., 44 S.W.3d 86, 87 (Tex.
2001)).





[29]
The Fresh Coat Court noted that EIFS “is a synthetic stucco system made
of component parts manufactured by [K-2].”  Fresh Coat, Inc. v. K-2, Inc.,
318 S.W.3d 893, 897 (Tex. 2010).